[No. B040189. Second Dist., Div. Two. July 17, 1990.]

CALIFORNIA DENTAL ASSOCIATION et al., Plaintiffs and Appellants, v.
CALIFORNIA DENTAL HYGIENISTS' ASSOCIATION et al., Defendants and Respondents.

**COUNSEL**

Paul Lombardo, Mandel & Norwood, S. Jerome Mandel and Marleigh A. Kopas for Plaintiffs and Appellants.

Kathleen Lucas-Wallace, McDermott, Will & Emery, Donald A. Goldman and Timothy J. Waters for Defendants and Respondents.

## OPINION

**FUKUTO, J.**—The decisive issue in this case is whether the labor exemption to California's Cartwright Antitrust Act (Bus. & Prof. Code, § 16703) extends to concerted efforts by certain licensed professionals, acting through voluntary associations not presented as conventional labor unions, to increase and fix the levels of compensation paid them by other licensed professionals, under whose supervision they are legally required to work. Holding the exemption applicable, the superior court sustained without leave to amend the demurrer of respondents, a group of dental hygienists, to the second amended complaint of the California Dental Association and two individual dentists, which alleged respondents had conspired—by exchange of information, agreement, and boycott—to fix and inflate the compensation paid by dentists to hygienists serving under them. As will be explained, we agree that respondents' alleged "price-fixing" activities are exempt from the Cartwright Act, and accordingly we affirm the dismissal.

### FACTS

The material allegations of the second amended complaint are as follows.[1] Plaintiff California Dental Association (hereafter CDA) is an incorporated voluntary association that includes about 70 percent of licensed California dentists. Its purposes generally include representing the interests of dentists in matters affecting their profession. Plaintiffs Robert Brundin and Frank Satinover are licensed dentists who separately practice in Los Angeles County.

Defendant California Dental Hygienists' Association (hereafter CDHA) is an incorporated voluntary association of dental hygienists who are licensed to practice by the Board of Dental Examiners. On information and belief, "CDHA members constitute a significant, if not majority, share of the market power of the dental hygienist services providers in California." Defendant Shea Shannon is a licensed dental hygienist and a past president of CDHA. She is alleged to have acted, in part, independently of that position. Finally, each of defendants Los Angeles Dental Hygienists Society and San Francisco Component of the California Dental Hygienists'

---

[1] In evaluating the sufficiency of this complaint following the sustaining of a general demurrer without leave to amend, we follow familiar rules. (See, e.g., *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 266 [195 Cal.Rptr. 211, 41 A.L.R.4th 653]; *Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 18 [126 Cal.Rptr. 327].) We also heed (although not nearly so significant to this case as respondents urge) the rule that a plaintiff may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 1117-1118, pp. 533-536.)

Association (hereafter LA Hygienists and SF Hygienists) is alleged to be "a component or local society of CDHA . . . [but] a business entity legally separate, distinct and apart from CDHA." Again on information and belief, plaintiffs allege that CDHA, LA Hygienists, and SF Hygienists "are not unions or collective bargaining representatives under state or federal law, and have never negotiated a single collective bargaining agreement with any employer or representative of an employer of dental hygienists."

Having identified the parties,[2] plaintiffs expound the "market." Under California law dental hygienists not only must be licensed but also—with rare exceptions in the form of pilot programs—may provide services only under the supervision of a licensed dentist (albeit the level of supervision may vary depending upon the procedures performed).[3] To this end, dentists "typically" retain hygienists to assist in providing dental services to the dentists' patients, including procedures commonly known as cleaning of teeth. Dentists most often contract for a hygienist's services on a "temporary" basis, e.g., two days a week; "[i]t is unusual for a dentist to retain an individual hygienist on a full time, 5 days a week basis." Hygienists usually are paid either a per diem (e.g, $180 a day) or a percentage commission, such as 40 percent of the dentist's charges to the patient for the hygienist's procedures. Because of the requirements of supervision, hygienists cannot themselves directly bill patients; rather, they bill the dentist who supervises their work, while the dentist charges the patient a dentist's fee that "covers" the services provided by the hygienist. Hygienists "compete among themselves" to work in dental offices "for a fee and at a price to be paid by the dentist or dental office directly to the hygienist." From the foregoing, plaintiffs conclude that dentists are purchasers or consumers of dental hygienist services, and hygienists are sellers or providers of services to the dentists, albeit that "[i]n this setting dental hygienist services rendered to a patient must be provided under the supervision of a licensed dentist."[4]

Plaintiffs proceed to allege that within the preceding four years, the defendants "have combined, conspired, and agreed together to restrain trade and fix and maintain the price and/or commission at which dental hygienists will and do provide services to dentists and dental offices throughout the State of California." In summary, defendants have

[2] Plaintiffs also designate 200 fictitiously named defendants, alleging that some are individuals and the rest are corporations or other associations, and that all are members of the conspiracy later charged.

[3] The law governing this subject is found in Business and Professions Code sections 1758-1762, and in title 16, California Code of Regulations, sections 1088-1089, of which we take mandatory judicial notice (Evid. Code, §§ 451, subd. (b), 459, subd. (a)).

[4] Paragraph 12 of the pleading alleges: "With the exception of the [pilot] program, dentists are the only consumers/purchasers of dental hygienist services in the State of California."

eliminated competition for "the cost and price of dental hygienist services provided to dentists," and have "clandestinely exchanged" information as to the fees of hygienists in 24 areas of the state served by CDHA, with the intent and effect of increasing those prices throughout the state. The next paragraph of the complaint, including a set of exhibits incorporated by reference, describes the following actions taken in pursuance of the alleged combination and conspiracy.

(1) Defendants have conducted "secret" surveys of their members and others, thereby ascertaining the fees ("salaries" in the original two complaints) paid hygienists in CDHA's 24 geographic regions. The survey results have been circulated to CDHA's individual members and local components, with the purpose and effect of "restraining trade and artificially increasing the fees and/or commissions for dental hygienist services provided by dental hygienists to dentists . . . ." Attached as exhibits are exemplary copies of defendants' survey materials. They include forms for reporting hygienists' salaries or commissions, fees for particular procedures, fringe benefits, and number of patients seen, with respect to each dental office served by the responding hygienist. The survey results consist of a one-page table summarizing the average daily income of hygienists for the years 1985, 1986, and 1987, listed by reference to 23 of CDHA's 24 geographical "components."

(2) Defendants have conducted seminars and workshops at which they disseminate the survey results to CDHA members, with the purpose and effect of fixing or at least increasing prices and costs of hygienist services. CDHA has told its members that participating in these activities and "adherence" to the survey results will increase the price and cost of their services, and conversely that those who do not participate will not earn increased fees.

(3) CDHA, LA Hygienists, SF Hygienists, and certain Doe defendants have conducted employment referral programs for their hygienist members, with the purpose and effect of restraining trade and artificially increasing hygienist fees. On information and belief, attendance at the employment workshops is a precondition to using these referral services; plaintiffs attach 1985 board minutes of SF Hygienists, reciting that "anyone who wants to use the employment service must take the workshop," offered by defendant Shannon. Apparently through these referral programs, the association defendants either have refused to refer member hygienists to dentists who will not pay the fixed prices demanded, or have encouraged their members not to provide services to (in the first amended complaint, "not to work for") or interview with dentists who will not meet the price demands.

(4) Shannon has encouraged hygienists, at seminars she conducts, to refuse to work for dentists who do not pay the cost or price ("salaries," in the first amended complaint) fixed by defendants, and to exchange information about the rates hygienists charge, with the goal and effect of "artificially" elevating the price of hygienist services. On information and belief, CDHA as well as Shannon have encouraged hygienists to exchange such price information orally, to conceal the exchange and avoid antitrust liability.

(5) Finally, CDHA has conspired with nondefendant entities, including commercial employment agencies, to suppress competitive price and commission information. To this effect, plaintiffs attach a newsletter from a Los Angeles employment agency serving dental offices, which listed salary averages for dental hygienists and other dental office personnel in California, the Midwest, and the Southeast, and a responsive letter from then CDHA president Shannon. The letter stated that publication of these rates threatened either the jobs or the salary levels of hygienists earning more, and urged either that such figures not be published and instead be disclosed orally, or that no "ceiling" be placed on them.

Concluding their statement of cause of action, plaintiffs allege that as a consequence of defendants' alleged acts: (a) competition for the price of hygienist services has been restrained and eliminated; (b) the price at which those services are provided (in the first amended complaint, "*i.e.*, salaries of dental hygienists") has been maintained at "a high and artificial level;" and (c) dentists have been "deprived of the benefit of free, competitive negotiations" for the purchase of such services (in the first amended complaint, "determination of salary levels") and have been forced to accept artificially high fee terms (in the first amended complaint, "salaries"). In addition, LA Hygienists has refused to refer anyone to fill a position in plaintiff Brundin's office because he declined to pay a fee of $200 per day, resulting in loss of profits and goodwill. Moreover, LA Hygienists has encouraged its members to boycott plaintiff Satinover's office, describing him as "cheap," and thereby causing him economic damage.

Plaintiffs allege that defendants' activities will cause irreparable harm, for which plaintiffs and the individual members of CDA lack an adequate remedy at law because their damages are difficult to ascertain and measure. Plaintiffs therefore pray, in addition to treble damages and interest, for injunctions restraining the defendants from (1) compiling or communicating any survey of hygienists' fees or commissions; (2) conducting any employment seminar, referral program, or other group activity in which hygienists are encouraged to disclose or discuss their fees; and (3) refusing to

refer hygienists to any dentist "because of the fee or commission that dentist has paid or will pay for dental hygienist services."

The charging allegations of the second amended complaint did not differ significantly from those of plaintiffs' previous two pleadings. However, the original complaint included only CDA as plaintiff and named only CDHA and Shannon as defendants. After they demurred to the complaint on grounds, among others, that CDA lacked standing to sue for antitrust injuries, CDA by stipulation filed a first amended complaint, adding Brundin and Satinover as plaintiffs and LA Hygienists and SF Hygienists as defendants, as well as the allegations of damage suffered by the two individual dentists.

All respondents then generally demurred to the first amended complaint. The demurrer challenged CDA's standing, contested respondents' legal capacity to have conspired among themselves, and contended that respondents' alleged acts did not constitute an antitrust violation, in part because they were exempt activities of a labor organization.

At the hearing of the demurrer, plaintiffs' counsel admitted there were "problems" with CDA's maintaining an action for damages to itself, as contrasted with a representative action for injunctive relief. The court's greater concern, however, was over the fundamental allegation that respondents' conduct constituted an actionable restraint of trade. Although acknowledging that California (and federal) antitrust laws apply to licensed professionals, the court stated, "I don't see it as being the same with regard to people who are closer to the labor at a service level as distinguished from a business."[5] On this basis, the court sustained the demurrer, granting leave to amend but expressing skepticism plaintiffs could state a cause of action.

To the second amended complaint, plaintiffs added the exhibits illustrating respondents' actions, as well as the following previously noted allegations: (a) that the organizational defendants were not "labor unions" and had not negotiated collective bargaining agreements; (b) that hygienists compete with each other to provide services; (c) that dentists are the sole

---

[5] The following colloquy illustrates the positions of plaintiffs and the court: "THE COURT: Okay. What is the pricing information which the complaint alleges they have exchanged? [¶] MR. MANDEL: Salary information. One, they have exchanged salary information, and, two, they have refused to refer hygienists to practicing dentists who will not agree to pay a minimum level of compensation. [¶] THE COURT: In my view salary information, among people performing the kinds of activities that I have already cited, that which you glorify as salary information, meaning what it is hygienists are asking to be compensated by individual dentists as a condition of accepting employment with those dentists, does not constitute impermissible horizontal price fixing, absent something more."

consumers of these services (see fn. 4, *ante*); (d) the allegations about how hygienists are compensated and their services billed; and (e) that CDHA conspired with nondefendant persons including employment agencies.

Respondents again demurred, on the same grounds as previously. The court this time sustained the demurrer without leave to amend, holding that respondents' activities in pursuit of higher compensation were not within the purview of the Cartwright Act.[6]

The court then took up CDA's demurrer to a cross-complaint which CDHA and Shannon had filed against CDA. The court sustained CDA's demurrer but granted leave to amend as to two of three causes of action. At this point, the court informed plaintiffs' counsel that although the "one judgment rule" normally would preclude an appeal "until the cross-complaint is resolved," the court was willing to enter a separate judgment of dismissal of the complaint, to enable plaintiffs to appeal immediately, if they desired. Counsel accepted this offer, and the court subsequently signed and filed its order, dismissing the second amended complaint with prejudice and reciting, "the Court desir[es] to allow the California Dental Association to pursue its appeal of this decision without first waiting for resolution of any Cross-Complaint in this matter."

DISCUSSION

*1. Appellate Jurisdiction.*

Before considering the merits, we first must address the jurisdictional defect engendered by the superior court's just-described entry of "judgment" for the express purpose of creating a right to immediate appeal by CDA.[7] Although the unusual procedural posture of this litigation imparts sympathy for CDA's desire to appeal while still litigating a cross-complaint in the same action, both the parties and the trial court have seriously overestimated the latter's ability to override established limits to this court's appellate jurisdiction.

---

[6]The court stated, in part: " . . . this exchanging of salary information is a euphemism, in part for trying to set minimum standards, to encourage minimum standards, to promote minimum standards and salary demands on the part of the hygienists, but I just don't think that that's what the Cartwright Act was intended in its worst days to proscribe. [¶] . . . [¶] Because in my view there is some measure of protection afforded the employees in this scheme of things to attempt to better their lot, and attempting to compare them to licensed professionals like lawyers or doctors—yes, they're licensed, and yes, they are professionals—or to compare them to wholesale manufacturers or jobbers is to ignore the most salient element in this fact situation which is the nature of what they do, what they own, what they are selling and how they are compensated."

[7]We requested supplemental briefing on the question of jurisdiction over this appeal.

In civil matters, that jurisdiction is limited to the judgments and orders described in Code of Civil Procedure section 904.1. Although an order of dismissal following sustaining of a demurrer without leave to amend (Code Civ. Proc., § 581, subd. (f)(1)) is a judgment (Code Civ. Proc., § 581d) within the general characterization of Code of Civil Procedure section 904.1, subdivision (a), only *final* judgments are appealable under that subdivision (9 Witkin, Cal. Procedure (3d ed. 1985), Appeal §§ 43-44, pp. 66-68; Eisenberg et al. Cal. Practice Guide: Civil Appeals & Writs (1989) §§ 2.21-2.23, pp. 2-8–2-9), and there cannot be such a final judgment with respect to parties as to whom a cross-complaint remains pending, even though the complaint has been fully adjudicated. (9 Witkin, *supra*, § 56, p. 78.)

The policies underlying this rule—that informed, compact appellate review is best obtained by awaiting the entire action's coherent resolution in the trial court (see, e.g., *Kinoshita* v. *Horio* (1986) 186 Cal.App.3d 959, 966-967 [231 Cal.Rptr. 241])—manifestly apply in this case. CDHA's cross-complaint appears to be a skirmish in the same war out of which the complaint arises: CDHA also charges CDA with Cartwright Act violations, aimed at reducing competition among dental service providers, and indeed CDHA cites CDA's present lawsuit as one such anticompetitive act.[8] Moreover, CDA augmented the record in this appeal to include the latest version of the cross-complaint, on the premise it would afford this court greater awareness of CDHA's position in the litigation as a whole.

The final judgment rule thus clearly precluded CDA from pursuing an appeal from the dismissal of its complaint as to CDHA and Shannon while their cross-complaint against CDA remained pending and unresolved. And the trial court, much as it desired otherwise, was powerless to circumvent this jurisdictional barrier by the expedient of ordering a dismissal to that end. Although the final judgment rule has been relaxed to allow separate appeals as to causes of action that have been severed for purposes of trial (see 9 Witkin, *supra*, § 66, pp. 90-91; *id.* (1989 supp.) pp. 9-10), a "severance" to permit an early appeal exceeds the superior court's authority and is ineffectual. (*Armstrong Petroleum Corp.* v. *Superior Court* (1981) 114 Cal.App.3d 732, 736-737 [170 Cal.Rptr. 767].) In short, "it is clear that a court may not sever a complaint from a cross-complaint which remains to be tried merely to permit a plaintiff to immediately appeal the order dismissing the complaint." (*Will* v. *Engebretson & Co.* (1989) 213 Cal.App.3d 1033, 1038 [261 Cal.Rptr. 868].) CDA's appeal, at least as to CDHA and Shannon, is simply beyond our appellate jurisdiction.

---

[8] At the hearing on CDA's demurrer to the second amended cross-complaint, the court characterized the struggle between CDA and CDHA as "a bare knuckles brawl." CDHA's counsel responded, "It is, Your Honor, I agree with that."

There are, however, further considerations that counsel strongly against simply dismissing this phase of the appeal. First, insofar as the noncross-complaining defendants (LA Hygienists and SF Hygienists) are concerned, the dismissal does constitute a final judgment, from which CDA was entitled if not indeed obligated to appeal immediately. (*Sade Shoe Co.* v. *Oschin & Snyder* (1984) 162 Cal.App.3d 1174, 1177, fn. 1 [209 Cal.Rptr. 124]; see *Tinsley* v. *Palo Alto Unified School Dist.* (1979) 91 Cal.App.3d 871, 879-880 [154 Cal.Rptr. 591]; 9 Witkin, *supra*, § 49, p. 74.) Similarly, the dismissal clearly is final as to the individual plaintiffs, Brundin and Satinover, who also face no further proceedings in the trial court. (*Ibid.; Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122].) To exercise our mandatory jurisdiction over those plaintiffs' appeals, as well as that of CDA versus the local hygienist groups, but also defer consideration of CDA's own contentions concerning the dismissal as to CDHA and Shannon, would further the very fragmentation and multiplicity of appeals that the final judgment rule seeks to avoid. It would also, at least theoretically, remit the principal plaintiff and defendant to roles as amicus bystanders while a controversy that is principally theirs resolves itself.[9]

All parties, moreover, urge us to assume jurisdiction over the controversy as a whole. Accordingly, although CDA's appeal is jurisdictionally defective insofar as it relates to CDHA and Shannon, rather than dismissing it we will treat it to that extent as a petition for writ of mandate, and will decide that proceeding in conjunction with the rest of the appeal. (Cf. *Olson* v. *Cory* (1983) 35 Cal.3d 390, 400-401 [197 Cal.Rptr. 843, 673 P.2d 720].)

### 2. *CDA's Standing.*

■■■ A threshold issue, advanced by respondents' demurrers and reiterated here, is whether CDA has alleged facts establishing its standing to maintain this action.[10] Although the second amended complaint speaks of

---

[9] If the jurisdictional posture of this case as just described appears somewhat perverse, the blame lies not with the final judgment rule or its traditional application, but rather with the manner in which the parties, or at least some of them, have arrayed their claims. CDHA and Shannon's cross-complaint need not have been interposed in a lawsuit which those parties proved capable of terminating at the outset. Even assuming that the cross-claims were transactionally related to plaintiffs' complaint, they would not have become "compulsory" (i.e., barred if not asserted) unless and until respondents were required to answer the complaint. (Code Civ. Proc., § 426.30, subd. (b)(2); see also Code Civ. Proc., § 428.50, subd. (a) [permissive cross-complaint may be filed without leave of court with answer to complaint].) Thus, by less aggressive pleading, respondents could have won a total (and fully appealable) victory on their demurrers, and then asserted their claims against CDA in a separate action.

[10] At oral argument, respondents for the first time contended that the individual plaintiffs lack standing, because their allegations of injury by CDHA's conduct are indefinite. The argument lacks merit.

present and prospective injuries and damages to CDA as well as to its members, CDA has consistently disclaimed suing for money damages on its own behalf. Rather, CDA tenaciously argues that it is entitled to bring this action, as a representative of its members, to obtain the injunctive relief for which the complaint also prays. To this extent, CDA indeed has alleged facts sufficient to withstand dismissal.

■ Business and Professions Code section 16750, subdivision (a), provides a private right of action, for treble damages, interest, and, where appropriate, injunctive relief, to "[a]nyone who is injured in his or her business or property" by a violation of the Cartwright Act.[11] The "fact of damage" is thus an element of the cause of action, and a precondition of standing to bring it. However, in some cases, notably those of price-fixing, this element—not the amount of compensable damage, but the fact of damaging impact on the plaintiff or plaintiff class—may be established by presumption or inference. (See *B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1350-1351 [235 Cal.Rptr. 228].)

■ CDA alleges that its member dentists have suffered and are threatened with injury in and to their businesses, specifically by paying "artificially inflated fees and commissions," without "competitive negotiations." Respondents cannot contest that these allegations are sufficient to establish standing on the part of CDA's affected members. (See *ibid.*) Accordingly, with the addition of CDA's further allegations that it is an incorporated association of dentists, organized in part to represent them in matters affecting their profession, CDA may bring its claim for injunctive relief, to restrain alleged violations of public law which threaten injury to CDA's members. (*Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 121, 126-128 [109 Cal.Rptr. 724].)

In opposition, respondents rely on two United States Supreme Court decisions, *Warth* v. *Seldin* (1975) 422 U.S. 490, 515-516 [45 L.Ed.2d 343, 364-365, 95 S.Ct. 2197] and *Hunt* v. *Washington Apple Advertising Comm'n* (1977) 432 U.S. 333, 343 [53 L.Ed.2d 383, 394, 97 S.Ct. 2434], to the effect that an association lacks standing to assert a claim on behalf of its members where the claim depends heavily upon facts peculiar to the injured

---

[11] The statute's express reference to "preliminary or permanent injunctive relief when and under the same conditions and principles as injunctive relief is granted by courts generally under the laws of this state . . ." was added by an enactment which became effective the month after this action was commenced. An accompanying, uncodified provision stated, "The purposes of this act are to: . . . [¶] (b) Provide as *declarative of existing law* that courts have the authority to order preliminary or permanent injunctive relief in actions brought pursuant to Section 16750 of the Business and Professions Code." (Stats. 1987, ch. 865, § 1; italics added.)

members, and therefore requires their individual participation. Apart from the fact that these cases concern federal rather than California standing requirements, their analyses actually underscore why CDA is entitled to seek injunctive relief, as contrasted with damages. Both decisions observe that "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." (*Warth, supra,* 422 U.S. at p. 515 [45 L.Ed.2d at p. 364]; *Hunt, supra,* 432 U.S. at p. 343 [53 L.Ed.2d at p. 394].) In *Warth* the high court proceeded to hold that an association which, in contrast, sought discrete damages for various of its members did not have standing to do so. (422 U.S. at pp. 515-516 [45 L.Ed.2d at pp. 364-365].)[12] Moreover, in Hunt the court announced as a general rule "that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." (432 U.S. at p. 343 [53 L.Ed.2d at p. 394].)

The allegations of CDA's second amended complaint, as limited to a claim for injunctive relief, satisfy the foregoing test and, prima facie, the associational standing requirements discussed in *Residents of Beverly Glen, Inc.* v. *City of Los Angeles, supra,* 34 Cal.App.3d 117. Although, like the complaint in that case, CDA's pleading for purposes of standing "is not a model" (*id.* at p. 128),[13] it sufficiently alleges injuries to CDA's members, and facts showing CDA to be an appropriate representative for purposes of injunctive redress, to withstand dismissal on demurrer for lack of standing. (*Cf. id.* at pp. 128-129 [courts should liberally allow amendments to show adequacy of representation].)

---

[12] The same distinction was dispositive in the California case upon which respondents most heavily relied below, *County of San Luis Obispo* v. *Abalone Alliance* (1986) 178 Cal.App.3d 848, 863-864 [223 Cal.Rptr. 846]—"The cases relied on by plaintiffs sought declaratory or injunctive relief which would *inure to the benefit of the plaintiff organizations' members.* By contrast, the . . . plaintiffs here seek *damages* for harm supposedly suffered by their members . . . ." (Original italics; fn. omitted.)

[13] The *Beverly Glen* court found notably lacking an express allegation that the plaintiff there "was duly authorized to and does bring the action in a representative capacity on behalf of its members." However, the court was willing to indulge an inference to this effect. (34 Cal.App.3d at p. 128.) A similar inference may be drawn from CDA's allegation that its purposes include representing the interests of dentists in matters affecting their profession.

### 3. The Labor Exemption.

Respondents' demurrers asserted four separate reasons why the second amended complaint failed to state a cause of action for violation of the Cartwright Act. The most prominent ground, in essence adopted by the trial court, was the act's "labor exemption." As now explained, we agree that plaintiffs' complaint on its face showed respondents' allegedly actionable conduct to be insulated by this exemption from Cartwright Act liability. Hence we conclude, without having to reach respondents' other arguments, that the demurrer was properly sustained without leave.

The labor exemption to the Cartwright Act is found in Business and Professions Code section 16703 (hereafter section 16703), which provides: "Within the meaning of this chapter, labor, whether skilled or unskilled, is not a commodity."[14] This language links up with the act's listing of prohibited combinations for purposes including "[t]o . . . increase the price of merchandise or of any commodity" or "[t]o fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity . . . ." (Bus. & Prof. Code, § 16720, subds. (b), (d).)

Like its federal Clayton Act counterpart, section 16703 was intended to insulate from antitrust liability concerted activities by workers seeking to improve their working terms and conditions. Although the generally worded statute necessarily draws specific reach and limits from case law interpreting and applying it, one thing is clear: the exemption broadly covers combinations, agreements, and concerted activities for the purpose of negotiating or otherwise fixing workers' rates of wages or compensation. Three leading cases, upon which both plaintiffs and respondents rely, expound the reach of the exemption in this respect, and in the process indicate its limits.

The first case is *L. A. Pie Bakers Assn.* v. *Bakery Drivers, supra,* 122 Cal.App.2d 237 (hereafter *L. A. Pie Bakers*), in which an association of bakers sued a union whose members included two groups of delivery drivers: the bakers' own employees and a group of independent drivers who bought pies from the bakers and then resold them to the same types of customers (restaurants, hotels) that the employee drivers served. Refusing

---

[14] Respondents contend the exemption also derives from section 923 of the Labor Code. Although that declaration of policy bears upon the construction and scope of Business and Professions Code section 16703 (see *L. A. Pie Bakers Assn.* v. *Bakery Drivers* (1953) 122 Cal.App.2d 237, 241 [264 P.2d 615]; pp. 68-69, *post*), it is section 16703 that prescribes the exemption from the act of which it is a part. (See *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 927 [130 Cal.Rptr. 1, 549 P.2d 833].)

to agree to a contract specifying the independent drivers' compensation as a designated percentage discount from the bakers' retail prices, the bakers contended the contract was a price-fixing agreement, illegal under the Cartwright Act. The trial court sustained the union's demurrer without leave to amend, and this court affirmed, based on the labor exemption. We held it immaterial to the exemption that the independent drivers were not, strictly speaking, either employees or wage earners, and in fact "possess[ed] many of the characteristics of an independent contractor as distinguished from an employee." (*Id.* at p. 239.) More significant was that their "economic function" was the same as the employee drivers', and the compensation proposed for their services, "in essence, is the equivalent of wages for overall services in delivering the pies from plaintiffs' plants to the customers." (*Ibid.*) The exemption therefore applied to this form of "price fixing," because it covered wages, or their equivalent, and hence had "some reasonable relation to working conditions and the right and purposes of collective bargaining." (*Id.* at p. 243.)

The next case, *Messner* v. *Journeymen Barbers etc. International Union* (1960) 53 Cal.2d 873 [4 Cal.Rptr. 179, 351 P.2d 347] (hereafter *Messner*), followed the tests applied in *L. A. Pie Bakers*, and yielded an even more expansive application of the exemption. In *Messner* the court, per Justice Traynor, reversed an injunction against picketing of a barbershop to protest the refusal of the owner-barber and his four employee barbers to sign a contract requiring all of them to join the defendant union. After validating the union's activity under general California labor law principles, the court took up plaintiff's contention that the rejected contract, which would have set barbers' wages at a percentage of prices to be imposed for barbering services, violated the Cartwright Act. As applied to plaintiff and other barbershop owners who were subjects of defendant's organizational efforts, this contract plainly constituted an agreement of businessmen to set minimum prices for their establishments' services. Nonetheless, it was held exempt under section 16703, because its purpose was "not price-fixing, but wage-fixing." (53 Cal.3d at p. 886.) Inclusion of the employer-barbers in the arrangement was permissible and appropriate because they performed the same work as employee barbers, and their compensation was an appropriate subject of the overall, properly sought, wage stabilization. (*Id.* at pp. 886-887.)[15]

---

[15] In this connection, Justice Traynor generally summarized the labor exemption as follows: "Although human labor is not a 'commodity' under the act (§ 16703), a service consisting in the main of human labor is. Section 16703, however, *is not limited to exempting from the act agreements that set the price of labor.* 'Reasonably interpreted, [it] must be held to have been intended to except from the operation of the act combinations of laborers for the purposes of furthering their interests by collective bargaining, when not otherwise unlawful.' Accordingly, 'the real test in a particular case is the primary purpose of the agreement or

The final instructive case, *Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833] (hereafter *Palsson*), offered a different viewpoint of the exemption's dimensions. *Palsson* involved a real estate salesman, excluded from a local realty board and its multiple listing service, who contended the board's membership restrictions violated the Cartwright Act. Rejecting an amicus's argument that the act did not apply to the sale of services, Justice Mosk reiterated Justice Traynor's observation about services from *Messner* (fn. 15, *ante*), and explained: "As the *Messner* decision emphasizes, section 16703 was not designed to exempt the sale of services from the scope of the act. [Citation.] Nor, contrary to [amicus's] suggestion, is it a herculean task to determine when an activity is excepted from the act's coverage. The relevant question, in every case, is whether the practice in question is meant to further the interest of tradesmen as employees in a collective bargaining context, or whether it is designed to advance their interests as entrepreneurs. While perhaps under some circumstances that distinction may be difficult to draw, in the present case it is beyond dispute that the practices of the Marin County Board of Realtors bind the member[s] as businessmen, not as employees engaged in collective bargaining with employers. Section 16703 is, then, inapplicable." (16 Cal.3d at pp. 927-928.)

The facts upon which plaintiffs base their complaint clearly fall into the exempted area described by the above cases. Respondents are voluntary associations of dental hygienists and an individual hygienist, who was an officer of one of the associations. According to the second amended complaint, hygienists may and do provide care to dental patients only under the supervision of licensed dentists. Precluded from billing patients, hygienists are compensated by the dentists who "retain the[ir] services," for a daily rate or a commission percentage of the dentist's charges to the patient. The conspiracy alleged involves hygienists, by and through their associations, compiling and exchanging information about their compensation, agreeing or being exhorted to adhere to certain levels of demanded compensation, offering their services for employment through CDHA only at fixed minimum rates, and conversely refusing to work for dentists who will not pay those rates, all to the end of increasing and fixing or maintaining rates of pay. It requires no imaginative departure to see that what plaintiffs thus complain of as restraints of trade are nothing more or less than organizational and concerted activities of a sector of working people, for the classically legitimate labor objective of increasing the wages they are paid—the subject matter held exempt from the Cartwright Act, under Business and

---

combination in question.' Thus, a labor union, acting alone, violates the Cartwright Act only when its primary purpose is to accomplish a restraint of trade, not when its purpose is to obtain a valid labor objective." (53 Cal.2d at p. 886; italics added, citations omitted.)

Professions Code section 16703, in *Messner* and *L. A. Pie Bakers*, among other cases.

Plaintiffs' contrary argument that the hygienists are "entrepreneur service providers," whose "pricing" activities fall outside section 16703 as discussed in *Palsson*, is, in a word, untenable. As described in the complaint, hygienists cannot be considered "entrepreneurs" any more than may any other persons who work in another's business, under his or her supervision, for compensation paid by that supervising employer. By comparison, in *L. A. Pie Bakers*, the independent drivers, who possessed far more indicia of independent contractors, were treated for compensation-fixing purposes as within the labor exemption, because their practical "economic function" was akin to employees in the bakers' pie manufacture and distribution enterprise. Indeed, far from hygienists being "entrepreneurs," the Attorney General has determined that the statutes and regulations (alleged in the complaint) which dictate their subordinate relationship to dentists preclude them from establishing their own practices or offices, or from owning the portion of a dentist's practice in which hygienist services are provided to the public. (63 Ops.Cal.Atty.Gen. 465 (1980).)

█ ██ The allegation that hygienists compete with each other to sell their services to dentists and dental offices does not aid but in fact undermines plaintiffs' attempt to avoid the exemption.[16] In an unorganized labor market, "price competition" among workers may be familiar, and employers may hate to lose it. But that, of course, is one of the fundamental origins of the American labor movement, 20th century labor policy, and the labor exemption to the antitrust laws. ██ Both *L.A. Pie Bakers* and *Messner* validated compensation restraints placed on *independent entrepreneurs* because they, their work, and their wages, were "in direct competition with employee[s] and could affect the wage scale adversely . . . ." (*Messner, supra,* 53 Cal.2d at p. 887; accord *L. A. Pie Bakers, supra,* 122 Cal.App.2d at p. 239.) And at a national level, the United States Supreme Court similarly has held exempt restrictions on nonemployee

---

[16] Plaintiffs also contend that hygienists compete with dentists themselves, in providing services directly to the public. Of course, there are no allegations to this effect in plaintiffs' complaint, which paints a starkly different picture for purposes of alleging a cause of action. Rather, plaintiffs here seek to rely on allegations in CDHA's third amended cross-complaint against CDA, which apparently concerns the "pilot program" passingly referred to in the complaint as an exception to the dentist-hygienist relationship here at issue. The two pleadings obviously concern different activities and relationships. Moreover, in reviewing the legal sufficiency of the complaint as against respondents' demurrer, the disputed allegations of the amended cross-complaint, which was not even on file when the trial court sustained the demurrer, have no bearing. (Cf. *Joslin* v. *H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374-375 [228 Cal.Rptr. 878].)

orchestra leaders, in light of, and in order to control, their "wage competition" with employees. (*Federation of Musicians* v. *Carroll* (1968) 391 U.S. 99, 106 [20 L.Ed.2d 460, 466-467, 88 S.Ct. 1562]; cf. *Connell Co.* v. *Plumbers & Steamfitters* (1975) 421 U.S. 616, 622 [44 L.Ed.2d 418, 426, 95 S.Ct. 1830] ["The nonstatutory [federal labor antitrust] exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions."].) Accordingly, plaintiffs' allegations that respondents have conspired and allied to elevate and fix hygienists' salaries, and that dentists have thereby been denied a "competitive market" in the hiring of dental hygienists (see p. 9, *ante*) describe not a prohibited restraint of competition but rather a protected species of organized labor activity.[17]

■ Plaintiffs further contend, however, that this case falls outside the exemption because respondents' challenged activity neither constituted, nor occurred in the context of, collective bargaining. Plaintiffs here cite *Palsson*'s reference to practices "meant to further the interest of tradesmen as employees in a collective bargaining context" (16 Cal.3d at p. 927; see p. 25, *ante*), as well as the complaint's allegation that CDHA and its constituent associations are not collective bargaining representatives "under state or federal law, and have never negotiated a single collective bargaining agreement with any employer . . . of dental hygienists." Plaintiffs conclude that in this posture respondents cannot claim the labor exemption, particularly for pursuing "clandestine" exchanges of price (i.e., salary) information.

This line of argument poses an unrealistically narrow construction of the law and facts here at issue. Certainly, the goal of modern labor relations law in general, and the labor exemption to the Cartwright Act in particular, is to foster and preserve the integrity of collective bargaining by employees with employers. But collective bargaining itself cannot occur without antecedent employee activity, including the formation of labor organizations and internal agreement on terms to be presented at the bargaining table. Moreover, civil bargaining sometimes must be supplemented by more one-

---

[17] In seeking to characterize hygienists as "entrepreneur service providers," not covered by the labor exemption, plaintiffs cite a recent United States Supreme Court decision, condemning a fee-fixing boycott and "strike" by a group of District of Columbia indigent-defense lawyers. (*FTC* v. *Super. Ct. Trial Lawyers Assn.* (1990) 493 U.S. 411 [107 L.Ed.2d 851, 110 S.Ct. 768].) Plaintiffs particularly note that the high court did not even refer to the federal labor antitrust exemptions in evaluating the lawyers' conduct. The case is not in point. Factually, the defendant lawyers did not work—as contrasted with hygienists—in the offices of the District and under its mandated supervision. More important, they deliberately declined to assert the federal statutory labor exemption as a defense, whether or not it might have been available. (See *Superior Court Trial Lawyers Ass'n* v. *F.T.C.* (D.C. Cir. 1988) 856 F.2d 226, 230, fn. 6.)

sided activity, such as picketing, boycotting, or even striking. The history of the labor antitrust exemptions reveals that insulation of all of these concerted activities from liability was necessary and intended. (See *Allen Bradley Co.* v. *Union* (1945) 325 U.S. 797, 802-804 [89 L.Ed. 1939, 1944-1945, 65 S.Ct. 1533]; *Palsson, supra*, 16 Cal.3d at p. 927.) Indeed, practicality dictates that an exemption for "collective bargaining" or collective bargaining agreements alone would be an empty protection, because if other, enabling activities were actionable, the resting point of collective bargaining itself might never be reached.

Although California does not have a comprehensive labor relations regulatory statute, instructive here is section 923 of the Labor Code, which was derived from section 2 of the Norris-LaGuardia Act (29 U.S.C. § 102) and constitutes a declaration of "the public policy of this State," applicable generally and not only to the chapter of which it is a part. (*Chavez v. Sargent* (1959) 52 Cal.2d 162, 190-191 [339 P.2d 801], disapproved on other grounds in *Petri Cleaners, Inc.* v. *Automotive Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 475 [2 Cal.Rptr. 470, 349 P.2d 76].) Section 923 of the Labor Code declares in part, "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees . . . . Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Section 16703 therefore embraces not only collective bargaining agreements or activity practiced in the course of a bargaining session. Rather, it encompasses " 'combinations of laborers for the purposes of furthering their interests by collective bargaining' " (*Messner, supra*, 53 Cal.2d at p. 886), or, otherwise put, "practice[s] . . . meant to further the interest of tradesmen as employees in a collective bargaining context." (*Palsson, supra*, 16 Cal.3d at p. 927.) Two examples will illustrate. In *L. A. Pie Bakers*, a demurrer based on section 16703 was affirmed where the complaint alleged facts showing that the defendant union (1) had never negotiated a collective bargaining agreement on behalf of the independent contractors it sought to represent, and (2) was attempting to obtain agreement to its demands by "economic pressure." (122 Cal.App.2d at p. 238.) And in *Federation of Musicians* v. *Carroll, supra*, 391 U.S. 99, the federal Clayton Act labor exemption was held to embrace a set of fixed minimum prices for band engagements, offered to the public on a "take it or leave it" basis, because,

as in *Messner*, these prices directly affected and protected workers' wages. (391 U.S. at pp. 107-109 [20 L.Ed.2d at pp. 467-468].)

In sum, section 16703's exemption protects joint efforts of employees or working people to improve their compensation. These include collective bargaining as such, and also collective efforts as a precursor or adjunct to such bargaining. The activities alleged in the complaint all fall within this protected area. The most directly damaging to the individual plaintiffs, CDHA's refusal to refer hygienists to dentists for less than a demanded rate of pay, is either (or both) a wage boycott or a crude species of collective bargaining, of the "take it or leave it" variety or by way of an opening proposal. The hygienists' alleged adherence to higher prices, through agreement and exhortation, falls in much the same category. And the price information surveys, exchanges, and seminars, to the extent that they are more than informational and educational, constitute organizational activities of hygienists, for purposes of collectively achieving higher wages.

■ Along similar lines, plaintiffs' allegation that CDHA et al. are not "unions" does not operate to remove the exemption. Emphasizing that prior cases such as *L.A. Pie Bakers* involved conventional unions, and that the federal exemption provided in section 6 of the Clayton Act (15 U.S.C. § 17) specifically applies to "labor organizations," plaintiffs contend that section 16703 must be construed the same way, and assert that CDHA and its constituent defendants are not unions but "trade associations." The argument lacks merit.

First, the Cartwright Act exemption is more generally worded than the Clayton Act's, and its language does not bespeak any limitation to activities of labor unions. (But cf. *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 918 [221 Cal.Rptr. 575, 710 P.2d 375] (dictum) [". . . since labor organizations are expressly excluded from the statute (see Bus. & Prof. Code, § 16703), other groups not exempted should be deemed included."].) Second, even assuming section 16703 is to be construed with a view toward section 6 of the Clayton Act, whether an organization is exempt under that statute depends not on its name or form, but on whether it is "a bona fide labor organization, and not an independent contractor or entrepreneur." (*H.A. Artists & Associates* v. *Actors' Equity Assn.* (1981) 451 U.S. 704, 717, fn. 20 [68 L.Ed.2d 558, 570, 101 S.Ct. 2102].) Plaintiffs' complaint contains no hint (or allegation) that CDHA and its constituent associations are "independent contractors or entrepreneurs."

Moreover, the allegations of the complaint do establish that these defendants are "labor organizations," under relevant definitions. The National

Labor Relations Act defines "labor organization" in title 29 United States Code section 152(5), and an almost identical definition appears in Labor Code section 1117, part of the Jurisdictional Strike Act. The federal definition is: "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." (29 U.S.C. § 152 (5).) Significantly, the Supreme Court has held that this broad definition, and specifically its reference to "dealing with employers," is not limited to organizations engaged in collective bargaining. (*Labor Board* v. *Cabot Carbon Co.* (1959) 360 U.S. 203, 210-213 [3 L.Ed.2d 1175, 1180-1181, 79 S.Ct. 1015].) The allegations of the complaint as to the nature of CDHA, its members, and its activities, fit it comfortably within the legal definition of labor organization—if that truly be necessary under section 16703.[18]

Further relying on decisions applying the Clayton Act, plaintiffs contend finally that application of the Cartwright Act's exemption is foreclosed by the complaint's allegations that CDHA and its constituents have joined with "non-labor" entities, particularly the employment agencies with which CDHA is alleged to have conspired "for the purpose of suppressing competitive price and commission information pertaining to dental hygienist services."[19] Assuming, without deciding, that the California labor exemption is to be construed in conformity with the Clayton Act in this regard, plaintiffs' contention is refuted by the U.S. Supreme Court's most recent decision expounding and applying the Clayton Act exemption, *H.A. Artists & Associates* v. *Actors' Equity Assn., supra,* 451 U.S. 704.

In *H.A. Artists,* the court considered whether the federal antitrust laws applied to regulations imposed by Actors Equity—"a bona fide labor organization" (451 U.S. at p. 717, fn. 20 [68 L.Ed.2d at p. 570])—upon the activities of nonmember theatrical agents, who were licensed as employment agencies. (*Id.* at p. 707). The regulations required agents to secure Equity franchises, and limited their commissions for finding Equity mem-

---

[18] It is unnecessary to address at length the further assertion that activity exempt under section 16703 must arise out of a "labor dispute," as defined by the Norris-LaGuardia Act (29 U.S.C. § 113(c)). Suffice it to say that the controversy over respondents' means and methods of pursuing their quest for higher compensation by dentists, as manifested in this lawsuit, would qualify under the broad statutory definition. (See, e.g., *Federation of Musicians* v. *Carroll, supra,* 391 U.S. at p. 106 [20 L.Ed.2d at p. 466].)

[19] Plaintiffs also advert to their allegations that unidentified Doe defendants participated in the conspiracy, and that Shannon at times acted apart from her position with CDHA. But the fictitious name allegations do not allege involvement of or agreements with "non-labor" actors. And for the reasons discussed below, Shannon's lack of CDHA office during any of her activities alleged in the complaint would not thus defeat the exemption.

bers engagements. After tracing the history of these restraints as efforts to cure the " '[t]he evils of unregulated employment agencies'" and improve actors' employment conditions (*id.* at p. 708 [68 L.Ed.2d 564]), the court confronted "the threshold issue . . . whether or not Equity's franchising of agents involved any combination between Equity and any 'non-labor groups' . . . ." (*Id.* at p. 717 [68 L.Ed.2d at p. 564].) Because the agents' activities directly and influentially affected Equity members' compensation, as well as Equity's own efforts to maintain a wage scale, the court found that the agent regulations were exempt as necessary to preserving that scale, and "Agents must, therefore, be considered a 'labor group,' . . . ." (*Id.* at p. 721 [68 L.Ed.2d at p. 572].)

The same reasoning and result apply here. Plaintiffs allege that respondents have engaged in agreements with employment agencies to "suppress" salary information that would impede respondents' efforts to raise and maintain hygienists' compensation. The employment agencies therefore must be considered labor, not nonlabor, groups, both because—like their theatrical counterparts in *H.A. Artists* —they "stan[d] directly between [respondents'] members and jobs, and [are] in a powerful position to evade [respondents'] wage structure" (451 U.S. at p. 720 [68 L.Ed.2d at p. 572]), and because respondents allegedly have "combined" with them solely to achieve and maintain that compensation structure.

DISPOSITION

The order of dismissal is affirmed.

Roth, P. J., and Gates, J., concurred.