[No. S030829. May 12, 1994.]

JOHN M. MOREHART et al., Plaintiffs and Respondents, v.
COUNTY OF SANTA BARBARA et al., Defendants and Appellants.

**COUNSEL**

David Nawi, County Counsel, Stephen Shane Stark, Chief Deputy County Counsel, and Colleen Parent Beall, Deputy County Counsel, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Jan S. Stevens, Assistant Attorney General, Jamee Jordan

Patterson, Deputy Attorney General, Andrew B. Gustafson, Assistant County Counsel (Ventura) and Sally Grant Disco as Amici Curiae on behalf of Defendants and Appellants.

Hollister & Brace, Richard C. Monk, Lascher & Lascher, Wendy C. Lascher and Susan B. Lascher for Plaintiffs and Respondents.

Cox, Castle & Nicholson, Kenneth B. Bley, Ellman, Burke, Hoffman & Johnson, Howard N. Ellman, Michael J. Burke, McCutchen, Doyle, Brown & Enersen, Daniel J. Curtin, Jr., Robert E. Merritt, Jr., Maria P. Rivera, Clement, Fitzpatrick & Kenworthy, Clayton E. Clement, Nossaman, Gunther, Know & Elliott, James P. Corn, Baker & McKenzie, Timothy A. Tosta, Kerry Shapiro, William M. Pfeiffer, Judith K. Herzberg, Ronald A. Zumbrun, James S. Burling, Orrin F. Finch, Dun & Martinek, David E. Martinek and Deborah A. Boyd as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

LUCAS, C. J.—The Subdivision Map Act (Gov. Code, § 66410 et seq.) provides that contiguous parcels of land are not automatically merged by virtue of being held by the same owner. Such parcels "may be merged by local agencies only in accordance with the authority and procedures prescribed by this article" (*id.*, §§ 66451.10-66451.21], which "provide[s] the sole and exclusive authority for local agency initiated merger of contiguous parcels." (*Id.*, § 66451.10, subd. (b); all section references are to the Government Code unless otherwise indicated.)

Without following those statutory procedures, defendants County of Santa Barbara and its board of supervisors (county) amended the county's zoning ordinance to require that certain parcels be of a specified minimum lot size before being developed, *unless* the parcel was "held in separate ownership" on the date the rezoning was initiated. The amendments further require that the undersized parcels be combined (i.e., merged) in order to comply to the maximum extent possible with current density standards (see fn. 2, *post*).

Plaintiffs applied for a coastal development permit to build a residence on their undersized parcel. The county denied the application on the ground that plaintiffs could recombine their parcel with adjoining parcels. In plaintiffs' action against the county, seeking multiple kinds of relief, the trial court granted judgment for plaintiffs declaring that the county's recombination requirement was preempted by section 66451.10 and related provisions of

the Subdivision Map Act, and ordering issuance of a writ of mandate directing the county to set the denial of plaintiffs' application aside. The Court of Appeal reversed, holding that even though the act provides the exclusive means by which a county may impose a merger of parcels to control their sale, lease, or financing, the act does not prevent the county's zoning law from requiring merger as a condition to permitting development. We granted review to consider that holding.

Initially we are faced with a question of appealability. The judgment appealed from resolved fewer than all of plaintiffs' causes of action, but the Court of Appeal treated it as appealable under authority of a line of Court of Appeal decisions holding that an appeal can be taken from a judgment on causes of action that have been severed from other remaining, separate and independent causes of action. We shall conclude that the judgment was not appealable but that because of unusual circumstances, including the state-wide importance of the issues, we should determine the correctness of the judgment as a basis for determining whether to direct the Court of Appeal to issue a peremptory writ to the trial court.

On the merits, we agree with the Court of Appeal that the Subdivision Map Act's exclusive procedures apply by their literal terms only to mergers imposed to control the sale, lease, or financing of the merged parcels. The statutory context and history, however, indicate that section 66451.11 was intended to prescribe the standards by which local agencies can impose mergers for purposes of development as well, and reflects a paramount state concern for uniformity in those standards. We shall conclude, therefore, that although the act does not alter a county's power to prescribe minimum lot sizes in zoning ordinances, the act does impliedly preempt any local zoning ordinance provision that purports to require, as a condition to issuance of a development permit, a merger of parcels that the county could not compel under section 66451.11. Accordingly, the trial court correctly adjudged the county ordinances to be invalid, and the judgment of the Court of Appeal must be reversed with directions to dismiss the appeal.

## I. FACTS AND PROCEDURAL BACKGROUND

Plaintiffs John and Frances Morehart own block 132, a parcel of about 3.7 acres shown on the map entitled, "Plan of Naples, Seventeen Miles West of Santa Barbara Cal.," filed in the county records in 1888. The Naples Townsite (Naples), comprising about 900 acres, appears on that map, as well as on the official county maps of 1888 and 1909, as a grid of lots, blocks, and streets that in fact were never developed. In 1977, a major portion of Naples was purchased by Morehart Land Company, a California corporation

of which 49 percent of the stock is held by plaintiffs and 51 percent by their nine adult children. At that time, the county had zoned Naples as agricultural, requiring 10 acres for each dwelling unit. In March 1981, the California Coastal Commission approved the county's local coastal plan, which increased the amount of land required for each dwelling in Naples to 100 acres.

On July 2, 1984, the county adopted two resolutions regulating "antiquated subdivisions," defined as those laid out on maps filed with the county prior to 1893, the year of California's first Subdivision Map Act. (Stats. 1893, ch. 80, § 1, p. 96; see Curtin et al., Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 1.2, p. 2.) The county resolutions (Nos. 84-298 and 84-299) initiated the rezoning of 10 such subdivisions, including Naples, into an "AS Antiquated Subdivision overlay district." The resolutions stated that "the adoption of [that rezoning] will require that lots . . . must be combined to meet minimum lot size requirements when application for a land use permit is made, except where such combinations are impossible because of the fact that lots are held in separate ownership prior to the date of [the] resolution initiating [the] rezoning." They further declared that the subdivisions' parcels would be eligible for issuance of a certificate of compliance (see § 66499.35; fn. 1, *post*) with an attached warning that the parcel may be subject to rezoning requiring a minimum lot size "unless the lots were held in separate ownership prior to [that] date." The resolutions thus established a cutoff date of July 2, 1984 (the date of their adoption), prior to which a parcel must be separately held to qualify for the exception to the minimum lot size requirement.

On June 28, 1984, four days before the cutoff date, Morehart Land Company made numerous conveyances of Naples parcels to plaintiffs, their children, and Morehart family corporations, in such a manner as to avoid common ownership of contiguous parcels. Thus, on the cutoff date of July 2, 1984, each of the eight parcels adjoining plaintiffs' block 132 was owned by one of plaintiffs' adult children, or by a corporation wholly owned by plaintiffs, or by Morehart Land Company.

On December 19, 1986, the county issued plaintiffs a certificate of compliance (see § 66499.35[1]) stating in pertinent part: "The parcel covered by this Certificate of Compliance is a legal parcel having been created in

[1]Section 66499.35 provides that on request of a property owner, a city or county must determine whether the property complies with the Subdivision Map Act or ordinances enacted pursuant to the act. If the property complies, the city or county must record a certificate of compliance. If it does not comply, the city or county may record either a certificate of compliance or a conditional certificate of compliance. The conditions imposed may be any that would have been applicable to the division of the property when the applicant acquired

1888 in compliance with the provisions of the California Subdivision Map Act and at that time there was no [county] ordinance enacted pursuant thereto. This parcel is not a developable building site until such time as the [county] determines that the parcel is properly served by domestic water, wastewater disposal, road access, and drainage and protected against flooding, bluff erosion, and soils problems." Similar certificates were issued between 1979 and 1987 for numerous other Naples parcels.

In September 1987, plaintiffs' application for a coastal development permit to build a single-family dwelling on block 132 was submitted to the county's resource management department. The application was rejected in May 1988 on the ground that because the 3.7-acre blocks adjoining block 132 were owned by plaintiffs' family members or corporations, recombination of the blocks appeared feasible so as to more nearly comply with the required 100-acre minimum lot size. Accordingly, block 132 was refused recognition as a parcel "held in separate ownership" under the antiquated subdivision resolutions of 1984. Plaintiffs' successive appeals to the county planning commission and to the board of supervisors were denied in November 1988 and February 1989 respectively.

Meanwhile, in August 1988, the county formally enacted two ordinances, Nos. 3718 and 3719, which establish the "AS Antiquated Subdivision overlay district," encompassing Naples, and require that parcels for which a coastal development permit is issued "be combined in order to comply to the maximum extent possible with current density standards."[2] The Coastal Commission approved the county's action in February 1989.

his or her interest. A recorded final map, parcel map, or "official map" constitutes a certificate of compliance with respect to the parcels it describes.

[2]Section 1 of Ordinance No. 3718 adds a new subsection 5 to section 35-128 of the county coastal zoning ordinance. It provides that "within any area designated as an AS Antiquated Subdivision overlay district pursuant to Section 35-102, no lot shall be excused from the minimum lot size requirements of the applicable specific district regulations of the Comprehensive Plan, except that a lot or lots with combined area insufficient to meet minimum lot size requirements for a single dwelling may be used as a single building site if such lot or lots were held in separate ownership prior to the date of a Board of Supervisors resolution initiating a rezoning to the AS Antiquated Subdivision overlay."

Section 2 of Ordinance No. 3718 adds the following provisions to the county coastal zoning ordinance: "*Sec. 35-102.AS Antiquated Subdivision Overlay District* [¶] *Sec.35-102.* 1. Purpose and Intent. [¶] The purpose and intent of this overlay district is to recognize that in certain instances subdivision maps have been recorded in the County, and that the lots on such subdivision maps are not consistent with current standards for parcel size according to the adopted zoning and general plan designations. By adoption of an overlay designation for such subdivisions, the parcels will be required to be recombined to the maximum extent possible to comply with current density standards. However, this designation shall not be applied to deprive property owners of all reasonable use of their property if a lot or lots with combined area insufficient to meet minimum lot size requirements were held in separate ownership prior to the date of a Board of Supervisors resolution initiating a rezoning to the AS Antiquated

In April 1989, plaintiffs commenced the present action against the county, alleging separate causes of action for (1) a writ of mandate, (2) damages for inverse condemnation, (3) damages for violation of civil rights, i.e., substantive and procedural due process and equal protection of law, (4) declaratory relief, and (5) injunctive relief. The complaint alleges that apart from the resolutions and ordinances on antiquated subdivisions, plaintiffs' block 132 qualifies under the county's zoning law as a residential building site, that the resolutions and ordinances are preempted by the Subdivision Map Act, and that in any event plaintiffs' block was excused from the minimum lot size requirement because plaintiffs' block and the adjoining blocks were "under separate ownership."

The first, fourth, and fifth causes of action for a writ of mandate, declaratory relief, and injunctive relief were ordered tried separately from the second and third causes of action, which sought damages for inverse condemnation and violation of civil rights. On May 17, 1991, the trial court filed a judgment as to the first, fourth and fifth causes of action. Along with the judgment, the trial court filed its statement of decision. That statement and the judgment recite that the decision is based on the administrative record and judicially noticed documents, as well as on the briefs and arguments of counsel.

The statement of decision initially rejects a statute of limitations defense (§ 65009, subd. (c)(2) [limit on time for challenging legislative decision to adopt zoning ordinance]), concluding that the suit was timely because it was filed within 120 days after Coastal Commission approval of the antiquated subdivision ordinances. The statement declares that the ordinances are preempted by the merger provisions of the Subdivision Map Act (§ 66451.10 et seq.) and are therefore unenforceable. The judgment similarly declares the ordinances to be preempted and void, and orders issuance of a peremptory writ of mandate commanding the county to cease enforcing the ordinances and to reconsider plaintiffs' application accordingly.

The peremptory writ was promptly served on the county, which, on June 6, 1991, filed both a return to the writ and a notice of appeal from the

Subdivision overlay district. [¶] *Sec.35.-102.2. Effect of AS Overlay District.* Within the AS overlay district, coastal development permits pursuant to Section 35-169 shall not be issued for a dwelling unit unless the parcel or parcels conform to the minimum area requirements of Sec. 35-128.5 [i.e., subsection 5 of section 35-128, *supra*]. [¶] *Sec. 35-102.3. Processing.* [¶] Prior to the issuance of a coastal development permit for a dwelling unit pursuant to Sec. 35-169, parcels within an AS Antiquated Subdivision overlay district shall be required to be combined in order to comply to the maximum extent possible with current density standards by recordation of a reversion to acreage, voluntary merger, final parcel map or final tract map."

Ordinance No. 3719 enumerates assessor's parcels, including plaintiffs' block 132, included in the "AS Antiquated Subdivision Overlay District."

judgment. The return states that the county "intends to vacate its decision to deny [plaintiffs'] application for a coastal development permit for their lot 132 . . . and to process said application." Plaintiffs acknowledge that the permit has in fact been issued.

On appeal, the Court of Appeal reversed the judgment, holding that the ordinances are not preempted and are therefore valid. The court viewed the Subdivision Map Act's merger provisions and the county's zoning ordinances as regulating different subjects, in that the act governs mergers for purposes of sale, lease, or financing, whereas the zoning ordinances require merger as a means of regulating development.

## II. THRESHOLD ISSUES

### A. *Appealability*

In the trial court, plaintiffs objected to a proposed statement of decision on the ground that it called for the entry of a judgment in their favor on their causes of action for a writ of mandate and declaratory relief, rather than simply ruling on the merits of those causes of action and deferring entry of a judgment until after determination of the remaining causes of action for damages for inverse condemnation and violation of civil rights. The trial court overruled the objection, stating that "[i]t makes no sense to get involved in a protracted trial on various damage claims without obtaining a final resolution on the issue of the validity of the County's ordinance."

Rule 13 of the California Rules of Court requires that an appellant's opening brief either "[state] that the appeal is from a judgment that finally disposes of all issues between the parties" or else "[explain] why the order or nonfinal judgment is appealable." The county's opening brief explained that the judgment was appealable because it resolved issues that had been severed from separate and independent issues remaining to be tried. The Court of Appeal disposed of the appealability question in a one-sentence footnote as follows: "The judgment is separately appealable on a severed issue. (Code Civ. Proc., § 1048; *Day* v. *Papadakis* (1991) 231 Cal.App.3d 503, 508 [282 Cal.Rptr. 548]; *Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 276, fn. 8 [3 Cal.Rptr.2d 504].)"

The theory of appealability relied on by the Court of Appeal was introduced into California jurisprudence by *Schonfeld* v. *City of Vallejo* (1976) 50 Cal.App.3d 401, 416-419 [123 Cal.Rptr. 669] (*Schonfeld*), and has since been developed, applied, and distinguished, but never disapproved, in a number of Court of Appeal decisions, including those cited by the present

Court of Appeal. The theory has not, however, been addressed by this court. Because of doubts about the correctness of the *Schonfeld* holding, and the holding's continuing effects upon appellate jurisdiction in California, we requested supplemental briefing on whether the trial court's judgment was appealable, and, if the judgment was not appealable, whether this court should reach the merits by considering whether to direct the Court of Appeal to treat the notice of appeal as a petition for a writ of mandate. In response to our first inquiry, neither side suggests any theory of appealability other than that of *Schonfeld*, and both sides answer our second inquiry in the affirmative.

In *Schonfeld, supra*, 50 Cal.App.3d 401, plaintiff asserted claims arising out of the defendant city's lease of a marina to Vallejo Marina, Inc. (VMI). The first cause of action alleged fraudulent representations inducing plaintiff to acquire interests in, and pay rent under, the VMI lease. The second cause of action claimed rights to enforce the lease as third party beneficiary and partial assignee. The fourth cause of action sought a declaratory adjudication that the purported partial assignment was a valid mortgage. Judgment was entered for the city on the first and second causes of action, leaving the fourth cause of action still pending.

On appeal, plaintiff *Schonfeld* contended that because the fourth cause of action remained pending, entry of the judgment was premature. The appellate court rejected that contention on the ground that because of certain orders of the trial court deemed to constitute a severance of the fourth cause of action (50 Cal.App.3d at p. 416, fn. 14),[3] the dismissal of the first two causes of action resulted in a final judgment. (*Id.* at p. 419.) The court

---

[3]In fact, the fourth cause of action in *Schonfeld* was not "severed"; instead the trial court ordered it be *tried separately*. The Court of Appeal in *Schonfeld* failed to recognize that Code of Civil Procedure section 1048 no longer authorizes severance of a civil action. A former version of the statute stated, in pertinent part: "An action may be severed and actions may be consolidated, in the discretion of the court . . . ." (Stats. 1927, ch. 320, § 1, p. 531.) In 1971, however, the statute was rewritten to its present form and no longer contains the term "severed," but instead grants trial courts the authority to "order a *separate trial* of any cause of action . . . or of any separate issue . . . ." (Italics added.) Unfortunately, the title given Code of Civil Procedure section 1048 by at least one publisher still contains the word "severance" (18A West's Ann. Code Civ. Proc. (1980 ed.) § 1048, p. 175), and the Legislative Committee Comment to Code of Civil Procedure section 1048, and many appellate courts, use the term "sever" to describe orders for separate trials within a single action.

In treating the fourth cause of action in *Schonfeld* as "severed pursuant to Code of Civil Procedure section 1048" (50 Cal.App.3d at p. 418), the *Schonfeld* court may have overlooked the fact that the order for separate trial of that cause of action was entered well before the 1971 amendment took effect on July 1, 1972. (See *Schonfeld, supra*, 50 Cal.App.3d at p. 406 [judgment appealed from was entered Feb. 7, 1972]). It is doubtful whether the pre-1971 version of the section authorized orders for separate trial of issues of causes of action, as distinct from severance of an action into two or more separate actions. (See legis. committee

reached that conclusion even though it properly recognized the general rule that " 'there can be but one judgment in an action no matter how many counts the complaint contains' " (*id.* at p. 417, quoting *Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697, 701 [128 P.2d 357]). The court further recognized that none of the established exceptions to the general rule were applicable to the case before it, but went on to explain as follows why it felt called upon to "augment the number of existing exceptions":

"[G]iven the workload of the appellate courts of this state, it would be an unnecessary and wasteful burden for all concerned to rigidly adhere to the one final judgment rule.[4] This court has previously indicated that pursuant to federal practice, separate appealable judgments may be rendered on counts that present separate claims for relief (Fed. Rules Civ. Proc., rule 54(b); see [citations].) . . . The test is whether the circumstances here presented are so unusual that postponement of the appeal until the final judgment on *Schonfeld*'s fourth cause of action would cause so serious a hardship and inconvenience as to require us to augment the number of existing exceptions [citations]." (50 Cal.App.3d at p. 418.)

The court then proceeded to announce its new exception: "[N]o reported case has dealt with the application of the one final judgment rule to a cause of action severed pursuant to Code of Civil Procedure section 1048. Under that statute, a trial court has broad discretion to consolidate or sever causes of action . . . .[5] Clearly, the declaratory relief [fourth] cause of action here was properly severed as it raises issues separate and independent from those

---

com., 18A West's Ann. Code Civ. Proc., *supra*, § 1048, at p. 176 ["Formerly, Section 1048 provided that 'an action may be severed' by the court but did not specifically authorize the severance of issues for trial."]). Since we conclude that a trial court's order for separate trial of a cause of action does not make a judgment on that cause of action appealable while other causes of action remain pending between the parties, it is unimportant for present purposes whether the *Schonfeld* order for separate trial of the fourth cause of action was expressly authorized by any statute then in effect.

[4]It seems anomalous to invoke "the workload of the appellate courts" as justification for relaxing the one final judgment rule. One of the purposes of the rule is to alleviate undue burdens on the appellate courts resulting from " 'piecemeal disposition and multiple appeals in a single action' " (*Knodel* v. *Knodel* (1975) 14 Cal.3d 752, 760 [122 Cal.Rptr. 521, 537 P.2d 353], quoting 6 Witkin, Cal. Procedure (2d ed.) pp. 4050-4051; see now 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 43, pp. 66-67; see *Day* v. *Papadakis* (1991) 231 Cal.App.3d 503, 512 [282 Cal.Rptr. 548] [overly broad relaxation of the rule has "grave potential for clogging appellate court dockets"]; *Kinoshita* v. *Horio* (1986) 186 Cal.App.3d 959, 966 [231 Cal.Rptr. 241].)

[5]Code of Civil Procedure section 1048, subdivision (b), as amended in 1971, provides: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action, . . . or of any separate issue or of any number of causes of action or issues . . . ." The Assembly Committee comment to the section states: "Section 1048 does not deal with the authority of a court to enter a separate final judgment on fewer than all the causes of action

of the first two causes of action.[6] [¶] We hold, therefore, that in the instant case, since the first two causes of action were properly severed, a final judgment resulted even though the independent fourth cause of action is still pending between the same parties." (50 Cal.App.3d at pp. 418-419.)

The majority of the appellate opinions that accept and apply this *Schonfeld* holding treat it as requiring, for appealability of a judgment on fewer than all issues, that the decided issues not only were ordered to be tried separately[7] by the trial court but also are perceived by the appellate court itself to be separate and independent from the issues remaining to be decided. (*De-Grandchamp* v. *Texaco, Inc.* (1979) 100 Cal.App.3d 424 [160 Cal.Rptr. 899] [appeal dismissed from judgment on "severed" cause of action because it was not separate and distinct]; *James Talcott, Inc.* v. *Short* (1979) 100 Cal.App.3d 504, 506, fn. 1 [161 Cal.Rptr. 63] [deciding appeal from partial summary judgment on causes of action to enforce debt guaranties because they were "totally 'independent'" from other causes of action alleging fraudulent conveyances of guarantors' assets]; *National Auto. & Casualty Ins. Co.* v. *Frankel* (1988) 203 Cal.App.3d 830 [250 Cal.Rptr. 236] [rejecting appeal from judgment on complaint "severed" from untried cross-complaint because the decided and undecided issues were closely related]; *Korean United Presbyterian Church* v. *Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 485, fn. 1 [281 Cal.Rptr. 396] [hearing appeal from judgment on "severed" issues because they were "reasonably separate and independent from the remaining untried issues"]; *Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 275-279 [3 Cal.Rptr.2d 504] [hearing appeal on issues that were actually "severed" and were "separate and independent" from undecided issues].) *Day* v. *Papadakis, supra,* 231 Cal.App.3d 503, adds to the requirements that the issues be tried separately and be independent from the remaining issues, a further requirement, based on *Schonfeld*'s above quoted language, that "the circumstances of this case are 'so unusual' as to

or issues involved in an action or trial. [Citations.] This question is determined primarily by case law, and Section 1048 leaves the question to case law development." (Legis. committee com., 18A West's Ann. Code Civ. Proc., *supra,* § 1048, at p. 176.)

⁶The "separate and independent" nature of *Schonfeld*'s fourth cause of action is open to question. In the second cause of action, he sought to enforce the lease as a partial assignee. The fourth cause of action sought a declaration that his interest was based on a valid mortgage and not an invalid assignment prohibited by the lease. (50 Cal.App.3d at p. 417; see also *id.* at p. 406.) The opinion upholds rejection of the claim as assignee (second cause of action) on the ground that the assignment for security was actually a mortgage (*id.* at p. 421); yet, the mortgage claim (fourth cause of action) could not be directly ruled upon because it remained pending in the trial court.

⁷In the cases discussed, *post,* it is unclear whether issues which were purportedly "severed" from other issues were in fact *formally* severed (such that two separate cases with separate docket numbers and separate judgments would be rendered), or were merely bifurcated, that is, certain issues or causes of action were ordered tried separately.

warrant abandonment of the [one final judgment] rule in this instance" (*id.* at p. 513).

Other decisions, however, disregard any inquiry into whether the decided issues were separate and independent from the undecided issues. Instead, they cite *Schonfeld* as a basis for appellate jurisdiction over a judgment determinative of fewer than all the issues simply on the ground that those issues were in fact severed by the trial court. (*Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 179 [215 Cal.Rptr. 881] [basing appealability on "de facto severance" of the cause of action underlying the appealed judgment]; *Bank of the Orient* v. *Town of Tiburon* (1990) 220 Cal.App.3d 992, 998, and fn. 8 [269 Cal.Rptr. 690] [reciting severance of the appealed judgment and treating "[t]his procedure" as "appropriate in these unusual circumstances"].[8])

In announcing its new exception to the one final judgment rule, the *Schonfeld* opinion purports to follow the examples of other judicially created exceptions. The examples cited apply one of two principles: (1) Judgment in a multiparty case determining all issues as to one or more parties may be treated as final even though issues remain to be resolved between other parties (see *Schonfeld, supra,* 50 Cal.App.3d at p. 417, citing *Johnson* v. *Hayes Cal. Builders, Inc.* (1963) 60 Cal.2d 572, 578 [35 Cal.Rptr. 618, 387 P.2d 394]; *Aetna Cas. etc. Co.* v. *Pacific Gas & Elec. Co.* (1953) 41 Cal.2d 785, 788-789 [264 P.2d 5, 41 A.L.R.2d 1037]; *Nicholson* v. *Henderson* (1944) 25 Cal.2d 375, 379-381 [153 P.2d 945]); and (2) the order appealed from may be amended so as to convert it into a judgment encompassing actual determinations of all remaining issues by the trial court or, if determinable as a matter of law, by the appellate court, and the notice of appeal may then be treated as a premature but valid appeal from that judgment; see *Schonfeld, supra,* 50 Cal.App.3d at p. 418, citing *Shepardson* v. *McLellan* (1963) 59 Cal.2d 83, 88-89 [27 Cal.Rptr. 884, 378 P.2d 108]; see also *DeGrandchamp* v. *Texaco, Inc., supra,* 100 Cal.App.3d 424, 431-433).

Those examples, however, are consistent with the codification of the one final judgment rule in Code of Civil Procedure section 904.1, subdivision

---

[8]*Bank of the Orient* disregards another significant judicial limitation on the *Schonfeld* holding. In *Armstrong Petroleum Corp.* v. *Superior Court* (1981) 114 Cal.App.3d 732 [170 Cal.Rptr. 767], a severance order rendered at the same time as a judgment on less than all causes of action for the express purpose of permitting an immediate appeal was held to be unauthorized by Code of Civil Procedure section 1048 (see fn. 5, *ante*) and therefore invalid. The *Armstrong* court distinguishes *Schonfeld* as permitting final judgments only on causes of action severed for trial, and even then only under "unusual" circumstances. (114 Cal.App.3d at pp. 736-737.) Armstrong was followed in *California Dental Assn.* v. *California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 58-59 [271 Cal.Rptr. 410], and approved in *Day* v. *Papadakis, supra,* 231 Cal.App.3d 503, 510-511.

(a). Subject to exceptions not applicable here, that subdivision authorizes appeal "[f]rom a judgment, except . . . an interlocutory judgment," i.e., from a judgment that is not intermediate or nonfinal but is the one final judgment. (*Knodel* v. *Knodel, supra,* 14 Cal.3d 752, 760.) Judgments that leave nothing to be decided between one or more parties and their adversaries, or that can be amended to encompass all controverted issues, have the finality required by section 904.1, subdivision (a). A judgment that disposes of *fewer* than all of the causes of action framed by the pleadings, however, is necessarily "interlocutory" (Code Civ. Proc., § 904.1, subd. (a)), and not yet final, as to any parties between whom another cause of action remains pending.

Before *Schonfeld* was decided in 1975, it was "well settled" in California that a judgment disposing of fewer than all causes of action between the parties was nonappealable even if those causes of action were separate and distinct from the causes of action remaining to be tried. (*U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 11 [112 Cal.Rptr. 18] [*U.S. Financial*].) *Schonfeld* expressly disagrees with *U.S. Financial* and attempts to justify its departure from the settled rule on the ground that "no reported case has dealt with the application of the one final judgment rule to a cause of action severed pursuant to Code of Civil Procedure section 1048." (50 Cal.App.3d at p. 418.) But that section was not intended to affect finality for purposes of appeal. ▓▓▓▓ �adsl▓ ▓ (See legis. committee com., 18A West's Ann. Code Civ. Proc., *supra,* § 1048, p. 176, quoted in fn. 5, *ante.*)[9]

*Schonfeld* also notes that under rule 54(b) of the Federal Rules of Civil Procedure (hereafter rule 54(b)), "separate appealable judgments may be rendered on counts that present separate claims for relief" (50 Cal.App.3d at p. 418) and suggests that the *U.S. Financial* court should have followed that court's inclination to adopt the substance of the federal rule (*ibid.*; see 37 Cal.App.3d at p. 11 ["Were we free to do so, we should be inclined to adopt the rule . . . ."]). The federal experience with rule 54(b), however, demonstrates the drawbacks of a rule that simply declares judgments on separate claims (however defined) to be appealable.

---

[9]There are sound reasons for the one final judgment rule. As explained in *Kinoshita* v. *Horio, supra,* 186 Cal.App.3d 959, "[t]hese include the obvious fact that piecemeal disposition and multiple appeals tend to be oppressive and costly. [Citing, inter alia, *Knodel* v. *Knodel, supra,* 14 Cal.3d 752, 766.] Interlocutory appeals burden the courts and impede the judicial process in a number of ways: (1) They tend to clog the appellate courts with a multiplicity of appeals. . . . (2) Early resort to the appellate courts tends to produce uncertainty and delay in the trial court. . . . (3) Until a final judgment is rendered the trial court may completely obviate an appeal by altering the rulings from which an appeal would otherwise have been taken. [Citations.] (4) Later actions by the trial court may provide a more complete record which dispels the appearance of error or establishes that it was harmless. (5) Having the benefit of a complete adjudication . . . will assist the reviewing court to remedy error (if any) by giving specific directions rather than remanding for another round of open-ended proceedings." (186 Cal.App.3d at pp. 966-967.)

As originally promulgated in 1939, rule 54(b) merely authorized the entry of judgment on one of several claims. The entered judgment was appealable if it qualified as a "final decision" under 28 United States Code section 1291. "However, it was soon found to be inherently difficult to determine by any automatic standard of unity which of several multiple claims were sufficiently separable from others to qualify for the relaxation of the unitary principle in favor of their appealability. The result was that the jurisdictional time for taking an appeal . . . in some instances expired earlier than was foreseen by the losing party. It thus became prudent to take immediate appeals in all cases of doubtful appealability and the volume of appellate proceedings was undesirably increased.

"Largely to overcome this difficulty, Rule 54(b) was amended, . . . [effective] 1948[, to provide that]: [¶] '. . . the court may direct the entry of a final judgment upon one or more but less than all of the claims only upon an express determination that there is no just reason for delay . . . .' [¶] To meet the demonstrated need for flexibility, the District Court is used as a 'dispatcher.' It is permitted to determine, in the first instance, the appropriate time when each 'final decision' upon 'one or more but less than all' of the claims . . . is ready for appeal. . . . A party adversely affected by a final decision thus knows that his time for appeal will not run against him until this certification has been made." (*Sears, Roebuck & Co.* v. *Mackey* (1956) 351 U.S. 427, 434-436 [100 L.Ed. 1297, 1305-1306, 76 S.Ct. 895], italics and fns. omitted; see *Curtiss-Wright Corp.* v. *General Electric Co.* (1980) 446 U.S. 1 [64 L.Ed.2d 1, 100 S.Ct. 1460] [explaining factors district court may consider in determining whether to enter final judgment on a separate claim]; Kallay, *A Study in Rule-Making by Decision: California Courts Adopt Federal Rule of Civil Procedure 54(b)* (1982) 13 Sw. U.L.Rev. 87 [discussing *Schonfeld*].)

The court in *Schonfeld, supra*, 50 Cal.App.3d 401, 418, explained that it was attributing appealability to a cause of action ordered to be tried separately only because of "circumstances . . . so unusual that postponement of the appeal until the final judgment on Schonfeld's fourth cause of action would cause so serious a hardship and inconvenience as to require us to augment the number of existing exceptions [to the one final judgment rule]." But like the original rule 54(b), the *Schonfeld* holding leaves it "inherently difficult to determine *by any automatic standard* . . . which of several multiple claims were sufficiently separable from others to qualify for . . . appealability" (*Sears, Roebuck & Co.* v. *Mackey, supra*, 351 U.S. 427, 434 [100 L.Ed.2d 1297, 1305], italics added), or to determine whether the "hardship and inconvenience" that would result from postponing appeal until final disposition of the entire action are sufficient to warrant immediate

appealability. If appealability under the *Schonfeld* holding is in doubt, the losing party must appeal immediately to avoid waiving rights to appellate review[10] and may receive no authoritative ruling on the appealability issue until the case has been briefed, argued, and decided. (An earlier determination of appealability may or may not result from proceedings to dismiss the appeal initiated by the respondent or the appellate court itself.)

The California judicial system provides another, more efficient avenue for obtaining a preliminary determination whether unusual circumstances make appellate review of an interlocutory judgment appropriate and, if the determination is affirmative, obtaining the review itself. The *Schonfeld* court's reference to "circumstances . . . so unusual that postponement of the appeal . . . would cause . . . serious . . . hardship and inconvenience" (50 Cal.App.3d at p. 418) seemingly describes circumstances that would make an appeal from the final judgment an inadequate remedy and thereby call upon the appellate court to issue an alternative writ of mandate as a means of reviewing the correctness of the trial court's interlocutory judgment. (Code Civ. Proc., § 1086; see 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, § 113, p. 748.) Petitioning for the writ enables the party against whom an interlocutory judgment has been entered to obtain a summary determination of the appropriateness of immediate review. If, on the other hand, the party chooses not to file the petition, the final judgment rule of Code of Civil Procedure section 904.1, subdivision (a), together with Code of Civil Procedure section 906 (see fn. 10, *ante*) protects the party's right to have the interlocutory judgment reviewed on appeal from the final judgment.

■ Accordingly, we hold that an appeal cannot be taken from a judgment that fails to complete the disposition of all the causes of action between the parties even if the causes of action disposed of by the judgment have been ordered to be tried separately, or may be characterized as "separate and independent" from those remaining. Statements to the contrary in *Schonfeld*, *supra*, 50 Cal.App.3d 401, and its progeny are disapproved.[11] A petition for a writ, not an appeal, is the authorized means for obtaining review of

---

[10]Code of Civil Procedure section 906 summarizes the rulings that are reviewable on appeal from a final judgment and then adds: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken."

[11]Any statements in the following cases contrary to our holding are disapproved: *DeGrandchamp* v. *Texaco, Inc., supra*, 100 Cal.App.3d 424; *James Talcott, Inc.* v. *Short, supra*, 100 Cal.App.3d 504, 506, footnote 1; *National Auto. & Casualty Ins. Co.* v. *Frankel, supra*, 203 Cal.App.3d 830; *Korean United Presbyterian Church* v. *Presbytery of the Pacific, supra*, 230 Cal.App.3d 480, 485, footnote 1; *Garat* v. *City of Riverside, supra*, 2 Cal.App.4th 259, 275-279; *Day* v. *Papadakis, supra*, 231 Cal.App.3d 503; *Highland Development Co.* v. *City of Los Angeles, supra*, 170 Cal.App.3d 169, 179; *Bank of the Orient* v. *Town of Tiburon, supra*, 220 Cal.App.3d 992, 998, and footnote 8.

judgments and orders that lack the finality required by Code of Civil Procedure section 904.1, subdivision (a). Because the trial court's judgment in favor of plaintiffs did not complete the disposition of all of plaintiffs' causes of action against defendant county, the judgment was not appealable.

## B. *Treating Appeal as Petition for Writ*

In response to our inquiry about appealability, both plaintiffs and the county strongly urge that we decide the merits of the appeal. The authors of the 11 amicus curiae briefs filed in support of both sides would undoubtedly concur.[12] Before deciding whether to reach the merits, however, we must consider what means for doing so are open to us after the changes in our jurisdiction made in 1985 by the amendment to article VI, section 12, of the California Constitution and by additions and amendments to the California Rules of Court, including rules 25, 28, and 29.4. "[T]he major change effected by the [Constitutional] amendment [is this]: the usual judgment of the Supreme Court on review will be that the Court of Appeal judgment is affirmed, reversed or modified. Under prior practice, the Court of Appeal judgment having been vacated and nullified by the grant of hearing, it was the trial court judgment that the Supreme Court affirmed, reversed or modified upon its decision of an appeal." (Advisory Com. Comment, Cal. Rules of Court, rule 29.4, West's Ann. Rules (1994 pocket pt.) rule 29.4, p. 55, parentheses omitted.)

In *Olson* v. *Cory* (1984) 35 Cal.3d 390 [197 Cal.Rptr. 843, 673 P.2d 720], we granted a petition for hearing and thereby brought the case here for decision as if the appeal had originally been taken to this court. (See *Knouse* v. *Nimocks* (1937) 8 Cal.2d 482 [66 P.2d 438]; 9 Witkin, Cal. Procedure, *supra*, Appeal, § 707, pp. 678-679.) After briefing and argument, we concluded that the order from which the appeal had been taken was not appealable, but that the records and briefs included in substance the elements necessary to a proceeding for writ of mandate, and that we had power to treat the purported appeal as a petition for that writ. We also decided to exercise that power because of the unusual circumstances that the case presented.

---

[12]Amicus curiae briefs in support of the county have been filed by the California Coastal Commission and the California State Association of Counties. Amicus curiae briefs in support of plaintiffs have been filed by the California Association of Realtors, the California Land Surveyors Association, the Consulting Engineers and Land Surveyors of California, the Pacific Legal Foundation, and the following entities asserting interests as owners of the indicated quantities of land: Coastal Forest Lands, Inc. (70,000 acres in Sonoma and Mendocino Counties), Huntington Beach Company (30,000 acres throughout California), Rancho San Carlos Partnership (20,000 acres in Monterey County), Sierra Pacific Industries (1.2 million acres of Northern California timberland), and Watson Land Company (substantial remaining amounts of the 75,000-acre Rancho San Pedro in Los Angeles County).

(*Olson* v. *Cory, supra*, 35 Cal.3d at p. 401.) Examining the merits, we held that the trial court's order purportedly appealed from was incorrect in several respects. Accordingly, we ordered the issuance by this court of a peremptory writ of mandate, directing the trial court to vacate its order and to make a new order consistent with this court's opinion. (*Id.* at p. 408.)

Under the new rules implementing the constitutional amendment, our decision on the merits of a case ordinarily culminates not in any orders or directions addressed to the trial court but in a remittitur to the Court of Appeal, accompanied by a certified copy of our opinion. (Cal. Rules of Court, rule 25.) Because the present trial court's judgment was nonappealable, the Court of Appeal lacked jurisdiction over the appeal, and the latter court's judgment of reversal must itself be reversed.

The question is, what directions to the Court of Appeal should accompany our reversal of its judgment if we reach the merits after concluding that the record and briefs and the presence of unusual circumstances make this an appropriate case for treating the appeal as a petition for writ of mandate? If in that event we have found a need for correcting the trial court's judgment, we should direct the Court of Appeal to treat the notice of appeal as a petition for a writ and to issue a peremptory writ of mandate to the trial court, directing that court to vacate its judgment and issue a different judgment or order consistent with this court's opinion. If, on the other hand, we have decided that the trial court's judgment need not be disturbed, we should direct the Court of Appeal to dismiss the appeal. The reasons for directing dismissal would be not simply the nonappealability of the trial court's judgment, but also the conclusion of this court, after considering the merits for the purpose of determining whether to direct the Court of Appeal to issue the writ, that issuance of a writ is not necessitated by any error in the trial court's judgment.

■ The next question is whether we should in fact reach the merits of the present case as a basis for determining whether to direct the Court of Appeal to issue the writ. The standards for making that determination are essentially the same as those outlined in *Olson* v. *Cory, supra*, 35 Cal.3d 390, 401, by which we decided under the former procedure whether we ourselves should treat the notice of appeal as a petition for the writ.

The briefs and record before us contain all the elements prescribed by rule 56 of the California Rules of Court for an original mandate proceeding. The functional equivalents of any necessary verifications (see Code Civ. Proc., §§ 1086, 1089) are supplied not only by the verified pleadings but also by the certifications of the clerk's transcript by the clerk of the trial court and of

the reporter's transcript by the clerk and the reporter. There is no indication that the trial court as respondent would wish to appear separately or become more than a nominal party to a writ proceeding. (*Olson* v. *Cory, supra,* 35 Cal.3d at p. 401; *People* v. *Cimarusti* (1978) 81 Cal.App.3d 314, 320 [146 Cal.Rptr. 421].)

Furthermore, the case in its present posture presents unusual circumstances making it appropriate to ascertain from the record whether there are substantive errors that the Court of Appeal should, by writ, order the trial court to correct. One circumstance is the considerable prior case law indicating that the present appeal was proper. Although we have now disapproved that line of authority, it made counsel's perceptions of appealability not unreasonable when the appeal was taken.

Judicial economy would not be served in this case by deferring resolution of the issues decided by the Court of Appeal until final judgment on all of plaintiffs' causes of action. The merits of those issues not only have been briefed by the parties and decided by the Court of Appeal, but also have been thoughtfully addressed by a diverse group of amici curiae (listed in footnote 12, *ante*) who seek clarification of the potential effect of local parcel merger requirements upon vast areas of California land, much of which was subdivided many decades ago. Further proceedings in the trial court would be unlikely to improve upon the record or briefing now presented to us for resolving the question.

Another circumstance we must consider relates to the apparent mootness as between the parties of the central question of the validity of the county ordinances. In response to plaintiffs' complaint, the county sought to justify its refusal to issue plaintiffs a development permit on the ground of their failure to comply with the ordinances' parcel merger requirements. The trial court's judgment declared the ordinances to be invalid because preempted by the merger provisions of the Subdivision Map Act and ordered the county to stop enforcing the ordinances and to reconsider plaintiffs' application for a development permit in light of the court's ruling. The county immediately ceased enforcing the ordinances against plaintiffs and issued them the permit. This compliance by the county with the trial court's writ eliminated the issue of the ordinances' validity as it affects the immediate dispute between the parties.

Despite this mootness, the issue remains of immediate importance to the orderly planning for possible development of thousands of other antiquated subdivision parcels held in Santa Barbara County and throughout the state by many landowners including plaintiffs themselves and their affiliates. "If an

action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise an inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot." (*Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213]; see *Downtown Palo Alto Com. for Fair Assessment* v. *City Council* (1986) 180 Cal.App.3d 384, 391 [225 Cal.Rptr. 559] [deciding moot issue of validity of Palo Alto city ordinance because of testimony that 50 other California cities had adopted similar ordinances].) The continuing public interest in the present issue and its likely recurrence is another unusual circumstance indicating that we should resolve the issue here.

Accordingly, in order to determine whether we should direct the Court of Appeal to issue a peremptory writ of mandate to the trial court for the purpose of correcting that court's judgment, we turn to the merits of plaintiffs' contention that the county ordinances are preempted by the merger provisions of the Subdivision Map Act.

### III. EXPRESS PREEMPTION

■ The general principles governing state statutory preemption of local land use regulation are well settled. "The Legislature has specified certain minimum standards for local zoning regulations (Gov. Code, § 65850 et seq.)" even though it also "has carefully expressed its intent to retain the maximum degree of local control (see, e.g., *id.*, §§ 65800, 65802)." (*IT Corp.* v. *Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 89 [2 Cal.Rptr.2d 513, 820 P.2d 1023].) "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*" (Cal. Const., art. XI, § 7, italics added.) " 'Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations].' " (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1986) 36 Cal.3d 476, 484 [204 Cal.Rptr. 897, 683 P.2d 1150], quoting *Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681]; accord, *Sherwin-Williams Co.* v. *City of Los Angeles* (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534].)

We first inquire whether the challenged ordinances enter an area fully occupied by general law "expressly," and shall later turn to the question whether they are within an area fully occupied "by legislative implication." The allegedly preemptive statute here is section 66451.10, subdivision (b) (hereafter section 66451.10(b)). It provides that sections 66451.10 through

66451.21 constitute "the sole and exclusive authority for local agency initiated merger of contiguous parcels," and that "parcels may be merged by local agencies only in accordance with the authority and procedures prescribed by [those sections]." The question of express preemption turns on whether the field thereby occupied encompasses the ordinances under which the county rejected plaintiffs' application for a development permit. "How the relevant field occupied by the allegedly preemptive state legislation is defined is often crucial to the result: 'If the definition is narrow, preemption is circumscribed; if it is broad, the sweep of preemption is expanded.' [Citations.]" (*Candid Enterprises, Inc.* v. *Grossmont Union High School Dist.* (1986) 39 Cal.3d 878, 886, fn. 4 [218 Cal.Rptr. 303, 705 P.2d 876].)

The county contends that the occupied field of mergers initiated and carried out by local agencies does not include zoning ordinance provisions that require merger of parcels for issuance of a development permit. ■ The county urges two grounds for that contention: (1) that section 66451.10(b) applies only to a requirement of merger for purposes of sale, lease, or financing, and not to merger as a prerequisite to development; and (2) that a merger effected by the owner to fulfill a prerequisite to development imposed by a zoning ordinance is not a "local agency initiated merger" (§ 66451.10(b)), because (a) the prerequisite becomes operative only when the owner decides to apply for the development permit, and (b) the required merger is put into effect not by the local agency but by the owner, who may choose whatever combination of contiguous parcels will satisfy the prerequisite. We agree that for both of those reasons, section 66451.10(b)'s preemption of "local initiated merger" does not *expressly* preempt the county ordinances. We consider each reason in turn.

A. *Merger "for the Purpose of Sale, Lease, or Financing"*

The literal terms of the Subdivision Map Act regulate the division of land into parcels only for purposes of sale, lease, or financing. The overall purpose of the act is to regulate *subdivisions*. (See, e.g., § 66411 [standards for local regulation of subdivisions]; § 66426 [tentative and final maps may be required for most subdivisions containing five or more parcels]; § 66428 [parcel map may be required for other subdivisions].) " 'Subdivision' means the division, by any subdivider, of any unit or units of improved or unimproved land, or any portion thereof, shown on the latest equalized county assessment roll as a unit or as contiguous units, *for the purpose of sale, lease or financing, whether immediate or future* except for leases of agricultural land for agricultural purposes." (§ 66424, italics added.)

Sections 66451.10 through 66451.21 deal with "merger of parcels."[13] Section 66451.10, subd. (a) (hereafter, section 66451.10(a)) provides: "Notwithstanding Section 66424, except as is otherwise provided for in this article, two or more contiguous parcels or units of land . . . shall not be deemed merged by virtue of the fact that the contiguous parcels or units are held by the same owner, and no further proceeding under [the Subdivision Map Act] or a local ordinance enacted pursuant thereto shall be required *for the purpose of sale, lease, or financing* of the contiguous parcels or units, or any of them." (Italics added.)[14]

Section 66451.10(b) provides that sections 66451.10 through 66451.21 "shall provide the sole and exclusive authority for local agency initiated merger of contiguous parcels. On and after January 1, 1984, parcels may be merged by local agencies only in accordance with the authority and procedures prescribed by [those sections]."

Section 66451.11 prescribes the conditions under which "[a] local agency may, by ordinance which conforms to and implements the procedures prescribed by this article, provide for the merger of a parcel or unit with a contiguous parcel or unit held by the same owner." The immediately subsequent sections specify the prescribed procedures and include detailed provisions for notice to the property owner, opportunity for hearing, and recordation by the local agency of a notice of the merger.

Section 66451.19, subdivision (d), provides: "The failure of a local agency to comply with the requirements of this article for the merger of contiguous parcels or units of land held in common ownership shall render void and ineffective any resulting merger or recorded notice of merger and no further proceedings under the [Subdivision Map Act] or a local ordinance enacted pursuant thereto shall be required *for the purpose of sale, lease, or financing* of those contiguous parcels or units, or any of them, until such time as the parcels or units of land have been lawfully merged by subsequent proceedings initiated by the local agency which meet the requirements of this article." (Italics added.)

The foregoing provisions purport to govern only those ordinances that impose or require merger of parcels as a condition to the parcels' sale, lease, or financing. The only consequence imposed upon a local agency's failure to comply with the prescribed merger-ordinance procedures is that the parcels may be separately sold, leased or financed as if unmerged.

---

[13]Sections 66451.10-66451.21 comprise article 1.5, entitled "Merger of Parcels," which was added in 1983 (Stats. 1983, ch. 845, § 2, p. 3097) to chapter 3, entitled "Procedure".

[14]The statutory language omitted from this quotation describes the parcels to which the provision applies. We hereinafter discuss and reject the county's contention that the omitted description does not include plaintiffs' block 132. (See *post*, pp. 760-762.)

The ordinances challenged by plaintiffs do not directly restrict the sale, lease, or financing of any parcel. The ordinances amend the county's zoning law. The purpose of a zoning law is to regulate the *use* of land. (See 1 Longtin's Cal. Land Use (2d ed. 1987) §§ 3.02-3.03, pp. 234-236.) The procedures by which counties or cities enact and administer zoning ordinances are regulated exclusively by sections 65800 through 65912. (§ 65802.)[15] Section 65850 states permissible purposes of local zoning laws; all those purposes pertain to land use. The purpose of the challenged ordinances, to regulate the minimum size of a lot on which a residence may be built, falls under subdivision (c) of section 65850, permitting zoning regulation of such matters as the location and size of buildings and "[t]he intensity of land use."

The challenged ordinances do not limit plaintiffs' rights to sell, lease, or finance block 132 or any other unimproved parcel of land. The possibility, or probability, that as a practical matter the restrictions imposed by the ordinances on the *use* of any parcel will drastically affect the *value* of those rights does not bring the ordinances within the scope of the express statutory preemption of ordinances imposing merger for purposes of sale, lease, or financing.

### B. *Merger Initiated and Carried Out by Local Agency*

Section 66451.10(b) provides: "This article [§§ 66451.10-66451.21] shall provide the sole and exclusive authority for *local agency initiated merger* of contiguous parcels. On and after January 1, 1984, parcels may be merged *by local agencies* only in accordance with the authority and procedures prescribed by this article." (Italics added.) A merger "by" a local agency is one that "becomes effective when the local agency causes to be filed for record with the recorder of the county . . . a notice of merger . . . ." (§ 66451.12).

Sections 66451.10 to 66451.21 thus expressly occupy the field of procedures for parcel mergers that are "local agency initiated" and are "by" the local agency. Plaintiffs contend that the challenged ordinances come within that field because they provide that before issuance of a coastal development permit, parcels "shall be *required* to be combined in order to comply to the maximum extent possible with current density standards" (Ord. No. 3718, § 2, italics added; see fn. 2, *ante*). An ordinance is not within the expressly occupied field, however, simply because it requires merger as a condition to granting an owner's request of permission to build.

---

[15]Section 65802 provides: "No provisions of this code, other than the provisions of this chapter [i.e., §§ 65800-65912], and no provisions of any other code or statute shall restrict or limit the procedures provided in this chapter by which the legislative body of any county or city enacts, amends, administers, or provides for the administration of any zoning law, ordinance, rule or regulation."

Under the county ordinances, no merger takes place unless the property owner takes the initiative by applying for a development permit. The ordinances may then require, as a condition to issuance of the permit, that the owner, not the county, merge certain parcels by recordation of a reversion to acreage, voluntary merger, final parcel map, or final tract map (Ord. No. 3718, § 2; see fn. 2, *ante*). The ordinances thus provide for the owner's implementation of the merger by means that section 66451.10(b) exempts from the exclusive procedural requirements for mergers initiated and effected by local agencies.[16] This provision for merger by the owner, instead of the county, may afford the owner a choice of which parcels to merge if there are alternative combinations that would meet the zoning requirements.

Accordingly, the ordinances are not expressly preempted by section 66451.10(b) because they are outside that statute's expressly occupied field of mergers initiated and carried out by local agencies.

### IV. IMPLIED PREEMPTION

#### A. *Applicable Test and Legislative History*

We next consider whether the Subdivision Map Act (the Act) impliedly preempts the challenged county ordinances. ■ "In determining whether the Legislature has preempted by implication to the exclusion of local regulation, we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra*, 36 Cal.3d 476, 485, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]; accord, *Sherwin-Williams Co.* v. *City of Los Angeles, supra*, 4 Cal.4th 893, 898; *IT Corp.* v. *Solano County Bd. of Supervisors, supra*, 1 Cal.4th 81, 90-91; *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 423

---

[16]Section 66451.10(b) states the following exceptions to its provision of "sole and exclusive authority" for mergers initiated and carried out by local agencies: "This exclusive authority does not, however, abrogate or limit the authority of a local agency or a subdivider with respect to the following procedures within this division: [¶] (1) Lot line adjustments [see § 66412, subd. (d)]. [¶] (2) Amendment or correction of a final or parcel map [see § 66469 et seq.]. [¶] (3) Reversions to acreage [see § 66499.11 et seq.]. [¶] (4) Exclusions. [¶] (5) Tentative, parcel, or final maps which create fewer parcels."

[261 Cal.Rptr. 384, 777 P.2d 157]; *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 708 [209 Cal.Rptr. 682, 693 P.2d 261]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 859-866 [76 Cal.Rptr. 642, 452 P.2d 930].)

The first and third tests do not, of course, establish implied legislative preemption.here. As we have seen, the Act expressly regulates only mergers of parcels initiated and carried out by local agencies to effect the parcels' sale, lease, or financing, and so does not fully cover the subject of zoning laws that require parcel merger as a condition to issuance of a development permit. As for the third test, the county ordinances present no basis for concern over their effect on transient citizens.

■ Our analysis therefore focuses on the second test, whether "the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further additional local action" (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d at p. 485). The material subject matter of the present zoning ordinances is a requirement that the owner of contiguous parcels merge them as a prerequisite to being granted permission to build on one of the parcels.

The statewide merger provisions (§ 66451.10 et seq.) appear to reflect two overall concerns. First, they provide landowners with elaborate procedural safeguards of notice and opportunity to be heard before their lots can be involuntarily merged. Second, although the merger provisions' literal terms apply only to local agency initiated merger of parcels for purposes of sale, lease, or financing, an examination of the "whole purpose and scope of the legislative scheme" (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 485) reveals a state concern over local regulation of parcel merger for purposes of development as well. Accordingly, we proceed to examine the relationship of these statutory concerns to the county ordinances by " 'study[ing] the history and purpose of the [state] enactment and the previous state of the legislation on the subject, as well as other statutes *in pari materia* and the benefits sought to be provided' " (*Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 677, fn. 9 [94 Cal.Rptr. 279, 483 P.2d 1231], quoting *County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]).

The Act's provisions on merger of parcels (§§ 66451.10-66451.21; see fn. 13, *ante*) were enacted in 1983 (Stats. 1983, ch. 845, § 2, p. 3097) and were modified by various amendments in 1984, 1985, and 1986. The enactment repealed (*id.*, § 1) and replaced former section 66424.2, which was adopted in its original form in 1976 (Stats. 1976, ch. 928, § 4, p. 2120) and amended or revised in 1977 and 1980 (Stats. 1977, ch. 234, § 5, p. 1034; Stats. 1980, ch. 402, § 2, p. 788; *id.*, ch. 1217, §§ 2-3, p. 4127). Each version of former section 66424.2, as well as the present legislation (§ 66451.10 et seq.),

begins by providing, subject to stated exceptions and qualifications, that "[n]otwithstanding section 66424 [defining 'Subdivision'] [. . .], two or more contiguous parcels or units of land . . . shall not [merge or be deemed merged] by virtue of the fact that [such] contiguous parcels or units are held by the same owner, and no further proceeding under the provisions of this division [the Act] or a local ordinance enacted pursuant thereto shall be required for the purpose of sale, lease, or financing of [such] contiguous parcels or units or any of them." (§ 66451.10; Stats. 1976, ch. 928, § 4, p. 2120; Stats. 1977, ch. 234, § 5, p. 1034; Stats. 1980, ch. 402, § 2, p. 788; *id.*, ch. 1217, §§ 2-3, p. 4127.)[17] Thus, the enactments apparently sprang from a concern that without them, section 66424 would cause contiguous units of land that had already been qualified as separate parcels under the Act to be automatically merged by virtue of common ownership and thus to require further compliance with the Act before they could be sold separately. As stated earlier, section 66424 generally defines a "subdivision" as "the division . . . of any unit or units of . . . land, . . . shown on the . . . county assessment roll *as a unit or as contiguous units*, for the purpose of sale, lease or financing . . . ." (Italics added.) The italicized wording has been part of the Act as far back as 1937.[18]

In 1973, a California Attorney General's opinion (56 Ops.Cal.Atty.Gen. 509 (1973)) concluded that because of the reference to "contiguous units" in section 66424, "the scheme of the Subdivision Map Act treats contiguous units under a common ownership as one unit with respect to the regulation of its later redivision." (*Id.* at p. 515.) The opinion said that applying the Act to the redivision enables local governments to obtain more effective compliance with community standards. "Were the parcels separately held by different owners, zoning ordinances which prohibit use of lots that previously were legal building sites, would then be constitutionally suspect . . . ." (*Id.* at p. 513.)

The opinion relied principally on our decision in *Hill* v. *City of Manhattan Beach* (1971) 6 Cal.3d 279 [98 Cal.Rptr. 785, 491 P.2d 369] (hereafter *Hill*), which is apparently the only California appellate decision that both addresses the question of treating otherwise separate parcels as merged by virtue of their common ownership and antedates any of the enactments of parcel merger provisions between 1976 and 1986, including former section

---

[17]The initial bracketed ellipsis pertains only to section 66451.10. The words "be deemed merged" in the third bracketed phrase replace the preceding word, "merge," in all but the 1976 enactment.

[18]See section 2, subdivision (g), of the Act, Statutes 1937, chapter 670, page 1874. When the Act was moved to the Business and Professions Code (Stats. 1943, ch. 128, p. 865), the definition of "subdivision" became section 11535 of that code. Present section 66424 was added in 1974, when the Act was moved to the Government Code (Stats. 1974, ch. 1536, p. 3464).

66424.2, and section 66451.10 et seq., and their amendments. The Attorney General's opinion characterizes the *Hill* decision as "inferentially approv-[ing] the concept that when a statute regulating land use treats adjoining or contiguous parcels under the same ownership as one parcel, the parcels will be regarded as 'merged.'" (56 Ops.Cal.Atty.Gen., *supra*, at p. 512.)

In *Hill*, an unimproved unit of land shown as a single lot on a recorded tract map was split into 2 parcels, each of about 5,300 square feet, without recordation of the split. After the adoption of a zoning ordinance prescribing a minimum lot size of 4,800 square feet, plaintiff acquired and built a house on one of the half-lots and thereafter acquired the other half-lot. Later, after the minimum lot size had been increased to 7,500 square feet, the defendant city rejected the plaintiff's application for a permit to build another house on the second half-lot. We held the rejection to be proper under the applicable ordinance and not unconstitutional. The ordinance permitted development on undersized parcels only if the parcel were (1) shown in a recorded subdivision, or (2) constituted a portion of a lot of which another portion contained a lawfully constructed dwelling "'under separate ownership from the remainder of the original subdivided lot as of the date of [the ordinance's] enactment'" (6 Cal.3d, *supra*, at p. 283).

Our *Hill* opinion discusses *Vetter* v. *Zoning Board of Appeal of Attleboro* (1953) 330 Mass. 628 [116 N.E.2d 277] as "a case closely in point" (6 Cal.3d at p. 283). In *Vetter*, denial of a building permit was upheld on similar facts, but plaintiff Hill sought to distinguish *Vetter* because the ordinance there included a provision that construction would be permitted on an undersized lot which "on the effective date hereof does not adjoin other land of the same owner available for use in connection with said lot" (quoted at 6 Cal.3d at p. 284). We characterized that provision as a "merger clause" and concluded that "[o]pposed to the implications raised by the absence of a merger clause [in the ordinance challenged by plaintiff Hill] are more compelling implications raised by those provisions [of the ordinance] which expressly preclude the individual development of [an undersized] parcel, whether or not adjacent to other lands under common ownership" (*ibid.*).[19]

Against this background, the Legislature enacted the various versions of former section 66424.2 between 1976 and 1980 and then, from 1983 to

---

[19]In 1976, the Attorney General issued an opinion having implications strikingly different from those of the 1973 opinion discussed in the text. The 1976 opinion concluded: "Where a unit of land has been subdivided in compliance with the Subdivision Map Act . . . and six contiguous unimproved lots of that subdivision are purchased by one individual who is not the original subdivider, . . . a sale of one of the lots does not constitute a division of land under section 66424 . . . ." (59 Ops.Cal.Atty.Gen. 239 (1976).) The 1973 opinion was distinguished on the grounds that there (1) the two parcels treated as merged were "created in compliance with both state and local law (without specific reference to . . . the Subdivision Map Act)," and (2) the opinion did not purport to interpret the Act but relied heavily upon the *Hill* decision, which "was based on an interpretation of the city ordinances defining a lot and

1986, the present parcel merger sections (§ 66451.10 et seq.) and their amendments. All of that legislation begins with a general negation of automatic parcel merger by virtue of common ownership, followed by a delineation of particular circumstances and conditions under which merger *will* take place. Those circumstances and conditions, which vary from statute to statute, are the primary indicators of the paramount state concern affecting the county ordinances before us.

The original section 66424.2 provided that "if any one of such contiguous . . . units held by the same owner does not conform to standards for minimum parcel size to permit use or development under a [local] zoning, subdivision, or other ordinance," and at least one of the parcels is not developed with a building for which a permit has been issued or was not required,[20] the parcels "shall be merged" for purposes of the Act unless an ordinance provides otherwise. (Stats. 1976, ch. 928, § 4, p. 2120.) Moreover, a local agency having knowledge of any such merger was required to record a notice of the merger, but was also required, at least 30 days before that recordation, to give the owner written notice specifying a time, date and place at which to show the agency why the notice of merger should *not* be recorded.

The 1977 amendment replaced the provision for automatic merger with one authorizing local agencies to adopt the merger provisions by ordinance. The ordinance could also deem any automatically merged parcels to be unmerged. (Stats. 1977, ch. 234, § 5, p. 1034.) In 1980, all parcels merged by operation of law (under the 1976 statute) and not deemed merged by ordinance were automatically deemed unmerged. (Stats. 1980, ch. 402, § 2, p. 788; *id.*, ch. 1217, §§ 2-3, p. 4127.)

The present merger provisions (§§ 66451.10-66451.21), enacted in 1983 and amended during the next three years, expand and elaborate upon former section 66424.2 by providing (1) stricter procedural safeguards for owners of contiguous parcels, and (2) specific substantive conditions, relating primarily to suitability for development, under which parcels would be eligible for merger. We turn to an examination of each of those two aspects of the merger provisions to ascertain whether either reflects " 'a paramount state concern [that] will not tolerate further or additional local action [i.e., the present county ordinances]' " (*People* ex rel. *Deukmejian* v. *County of Mendocino, supra,* 36 Cal.3d 476, 485, quoting *In re Hubbard, supra,* 62 Cal.2d 119, 128).

---

not upon a concept that any two contiguous lots in common ownership should be treated as one parcel for all purposes." (*Id.* at p. 241, distinguishing 56 Ops.Cal.Atty.Gen. 509, *supra.*)

[20]The 1977 amendment added, "or which was built prior to the time such permits were required by the local agency," and declared the addition "declaratory of existing law." (Stats. 1977, ch. 235, § 18, p. 1041.)

## B. *Merger Provisions' Procedural Safeguards*

Section 66451.11 provides that "[a] local agency may, by ordinance which conforms to and implements the procedures prescribed by this article [§§ 66451.10-66451.21], provide for the merger of a parcel or unit with a contiguous parcel or unit held by the same owner" if at least one of the parcels meets certain requirements. The prescribed procedures, found in sections 66451.12 through 66451.18 and described more fully in the margin, are somewhat elaborate.[21] The local agency must initiate a merger by a "notice of intention to determine status" that may be recorded as well as mailed to the record owner. (§ 66451.13.)[22] The owner may request a hearing and present evidence on whether the parcels meet the standards for merger specified in the ordinance. (§§ 66451.14-66451.16.) After deciding whether to merge the parcels, the local agency must record either a notice of merger or a release of the notice of intention to determine status. (§§ 66451.16-66451.18.)

Petitioners contend that the county ordinances improperly transgress a legislative intent that a required merger of parcels be accompanied by these procedural safeguards. But as the record in this case illustrates, a property owner receives just as much due process under the ordinances as would be

---

[21]The procedural provisions may be summarized as follows: A merger becomes effective when the local agency records (with the county recorder) a notice of merger, specifying the names of the record owners and describing the property. (§ 66451.12.) Before recording a notice of merger, the local agency may record, and send to the record owner by certified mail, a "notice of intention to determine status," stating "that the affected parcels may be merged pursuant to the standards specified in the merger ordinance" and "advising the owner of the opportunity to request a hearing . . . and to present evidence . . . that the property does not meet the criteria for merger." (§ 66451.13; for recent modification of this section, see fn. 22, *post.*) Within 30 days, the owner may file a "request for a hearing on determination of status." (§ 66451.14.) The local agency must then fix a time, date and place for the hearing, which must be held before the legislative body or an advisory agency within 60 days unless continued by mutual consent. The owner must be notified by certified mail. (§ 66451.15.) At the hearing, the owner may "present any evidence that the affected property does not meet the standards for merger specified in the merger ordinance." The local agency must then determine whether the parcels are to be merged and notify the owner of the determination. The merger ordinance may authorize a determination of nonmerger whether or not the parcels meet the standards for merger. (§ 66451.16.) If the owner does not file a timely request for hearing, the local agency may nonetheless make a determination of merger or nonmerger. (§ 66451.17.) A determination of merger must be recorded within 30 days in the manner provided by section 66451.12. (§§ 66451.16, 66451.17.) If the local agency decides against merger, it must record a release of the notice of intention to determine status and mail a clearance letter to the owner. (§ 66451.18.)

[22]By urgency statute, effective June 30, 1993, section 66451.13 was amended to provide that the local agency "may," rather than "shall," send to the owner by certified mail, and record, a notice of intention to determine status. (Stats. 1993, ch. 59, § 7.) The amendment is discussed at pp. 761-763, *post*, in connection with the county's contention that the merger provisions' preemptive effect has been suspended by the Legislature.

afforded under the Act's merger provisions. Under the Act, a merger of parcels is initiated by recorded notice to the owner of an intention to determine status. Such a notice would be superfluous under the ordinances because application of the merger requirement is initiated by the owner's own application for a development permit.

Under both the Act and the ordinances, an owner desirous of resisting the merger is entitled to a hearing. Here, plaintiffs were heard before the county's planning commission and board of supervisors. The only issue on which the Act provides a hearing is whether the property meets the standards for merger that are specified in the merger ordinance as authorized by the Act. (§§ 66451.13, 66451.16.) Here, plaintiffs were fully heard before the county's bodies on their contention that the ordinances' merger requirements did not apply because the parcels adjacent to plaintiffs' block 132 were under separate, rather than common, ownership.

Finally, the county ordinances provide that any merger they require be put into effect by the owner's own "recordation of a reversion to acreage, voluntary merger, final parcel map or final tract map." (Ord. No. 3718, § 2, amending § 35-102.3.) Thus, there is no need under the ordinances for the requirement, imposed by sections 66451.12 and 66451.16 through 66451.18 of the Act, that the county itself record a decision to merge or not to merge.

Since the county ordinances provide as much procedural protection to parcel owners as the Act's merger provisions (§§ 66451.12-66451.18), the ordinances are not impliedly preempted by the state concern underlying those provisions for the owners' procedural rights.

## C. *Merger Provisions' Substantive Requirements*

Section 66451.11 prescribes the specific conditions under which local parcel-merger ordinances may make parcels eligible or ineligible for merger. An ordinance may provide for merger of commonly owned contiguous parcels only if (1) one of the parcels is below the minimum size that a local zoning ordinance requires for development, and (2) one of the parcels is essentially undeveloped. (§ 66451.11; *id.*, subd. (a).) The local agency may then merge the parcels if any one of them is on land that was set aside on or before July 1, 1981, as open-space land (Rev. & Tax. Code, § 421), timberland (§ 51104, subd. (f)), agricultural land (§ 51201, subd. (b)), or land within 2,000 feet of "commercial mineral resource extraction," or if the parcel had been "identified or designated" prior to July 1, 1981, under the California Coastal Act of 1976, "as being of insufficient size to support

residential development." (§ 66451.11, subd. (b)(A)-(b)(E).)[23] Otherwise, merger is permitted only if one of the parcels comprises less than 5,000 square feet, or was not created in compliance with applicable law, or fails to meet current standards for sewage disposal, water supply, slope stability, or vehicular access, or "[i]s inconsistent with the applicable general plan and any applicable specific plan, *other than minimum lot size or density* standards" (§ 66451.11, subd. (b)(7), italics added). (§ 66451.11, subd. (b).)[24]

These conditions provide local agencies with broad authority to impose a merger of parcels that fail to meet any of numerous qualitative standards as building sites. The statute does not, however, authorize imposition of merger simply because a parcel is undersized by local zoning standards *unless* one of the parcels to be merged is less than 5,000 square feet. (§ 66451.11, subd. (b).)

---

[23]In the Court of Appeal, the county contended that the coastal development exception of section 66451.11, subd. (b)(E), applies to plaintiffs' parcel because, in 1980, the local coastal plan stated that development should be discouraged in Naples generally. Plaintiffs replied that neither their parcel nor any other Naples parcel had been individually identified or designated as too small for residential development, and that the county had permitted residential construction on other Naples parcels as recently as 1987. The county does not renew the contention in this court.

[24]Section 66451.11 provides that a local ordinance may provide for merger "if any one of the contiguous parcels or units held by the same owner does not conform to standards for minimum parcel size, under the [applicable] zoning ordinance . . . and if all the following requirements are satisfied:

"(a) At least one of the affected parcels is [essentially] undeveloped . . . .

"(b) With respect to any affected parcel, one or more of the following conditions exists: [¶] (1) Comprises less than 5,000 square feet in area at the time of the determination of merger. [¶] (2) Was not created in compliance with applicable laws and ordinances in effect at the time of its creation. [¶] (3) Does not meet current standards for sewage disposal and domestic water supply.[¶] (4) Does not meet slope stability standards. [¶] (5) Has no legal access which is adequate for vehicular and safety equipment access and maneuverability. [¶] (6) Its development would create health or safety hazards. [¶] (7) Is inconsistent with the applicable general plan and any applicable specific plan, other than minimum lot size or density standards.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"This subdivision [i.e., subdivision (b)] shall not apply if one of the following conditions exist: [¶] (A) On or before July 1, 1981, one or more of the contiguous parcels . . . is enforceably restricted open-space land pursuant to . . . Section 421 of the Revenue and Taxation Code. [¶] (B) On July 1, 1981, one or more of the contiguous parcels . . . is timberland as defined in subdivision (f) of Section 51104, or is land devoted to agricultural use as defined in subdivision (b) of Section 51201. [¶] (C) [and (D)] On July 1, 1981, one or more of the contiguous parcels . . . is located within 2,000 feet of [an existing or future] commercial mineral extraction [site] . . . . [¶] . . . [¶] (E) Within the coastal zone, as defined in section 30103 of the Public Resources Code, one or more of the contiguous parcels . . . has, prior to July 1, 1981, been identified or designated as being of insufficient size to support residential development . . . [by] either (i) . . . the land use plan portion of a local coastal program . . . , or (ii) prior to the adoption of a land use plan, . . . by formal action of the California Coastal Commission . . . ."

Here, plaintiffs' block 132, and all of the parcels contiguous to block 132, each exceeds three acres, far more than five thousand square feet. There is no contention that either plaintiffs' parcel or any of the contiguous parcels was eligible for merger under any of the standards laid down by section 66451.11. The question is whether the paramount state concern reflected by the statutory scheme impliedly preempts a zoning ordinance's requirement that parcels not eligible for merger under section 66451.11 be nonetheless merged as a condition to issuance of a development permit. We think that the statute does impliedly preempt any such local zoning requirement.

The legislative history we have recounted indicates a primary legislative concern over parcel merger as a means of enforcing zoning ordinance requirements of minimum lot size for *construction*, and not simply as a means of regulating the sale, lease, or financing of unimproved lots. The original parcel merger legislation (former § 66424.2) appears to have been prompted by the interpretation in an Attorney General's Opinion (56 Ops.Cal.Atty.Gen. 509, *supra*) of *Hill* v. *City of Manhattan Beach, supra*, 6 Cal.3d 279, which resolved a dispute over application of the defendant city's requirement of a minimum parcel size for *development*.

As originally enacted in 1976, former section 66424.2 provided for automatic merger of contiguous parcels (if one was undeveloped) whenever any one of them did "not conform to standards for minimum parcel size to permit use or development under a zoning, subdivision or other ordinance of the local agency." The following year, the section was amended to authorize local ordinances to provide for merger under those conditions. But so long as any of the commonly owned contiguous parcels was undeveloped and was less than the minimum size required for development by the local zoning or other ordinance, the section placed virtually no limit on the type or size of the parcels that could be merged.

Section 66451.11, on the other hand, imposes numerous alternative conditions that may make parcels eligible for compulsory merger under a local ordinance. (See fn. 24, *ante*.) Most of those conditions pertain to qualitative unsuitability for development. In the absence of all those conditions of qualitative unsuitability, parcels may not be merged unless one of them was illegally created or is less than 5,000 square feet. Legal parcels that are not unsuitable for development under the other standards and are 5,000 or more square feet in area may not be merged even though they fall short of the "standards for minimum parcel size, under the zoning ordinance of the local agency." (§ 66451.11.) These provisions clearly reflect a paramount state concern that uniform statewide standards govern local agencies' use of compulsory parcel merger as a means of enforcing zoning restrictions on

development. The development-oriented nature of practically all the statutory merger standards requires rejection of the county's contention that the statutory merger provisions are merely intended to restrict imposition of merger as a means of controlling the separate sale, lease, or financing of parcels without regard to their prospective development.

As already explained, the merger provisions (§§ 66451.10-66451.21) do not expressly preempt the county ordinances because those ordinances require merger only if and when the owner applies for a development permit, whereas the merger provisions apply literally only to local initiation and imposition of the merger of an undeveloped parcel with a contiguous parcel for purposes of restricting the separate sale, lease, or financing of either parcel regardless of whether the owner seeks permission for future development. Nonetheless, the effect of the county ordinances upon owners such as plaintiffs who do apply for a development permit is to require a merger even though none of the parcels to be merged meets any of the prerequisites for local agency initiated merger under section 66451.11. The obvious purpose of the ordinances is to enforce a local zoning requirement of minimum parcel size that could not be enforced by means of a merger ordinance under that section.

Section 66451.11 reflects a paramount state concern that statewide uniform standards govern the use of compulsory merger as a means of controlling development. That paramount concern impliedly preempts any merger requirements of local ordinances that fail to comply with the standards of section 66451.11, and accordingly preempts the county zoning ordinance provisions in question here.

In light of the county's expressed concerns about its power to regulate development in antiquated subdivisions, we emphasize the narrow scope of our holding. The Act's merger provisions do not preempt zoning ordinances that require, as a condition to development, the merger of parcels that could be merged by ordinance under section 66451.11. Nor do the merger provisions affect the applicability of zoning ordinances requiring minimum parcel size for development so long as the requirements are not conditioned upon parcel merger.

D. *Applicability to Antiquated Subdivisions*

■ The county contends that the Act's merger provisions (§§ 66451.10-66451.21) do not apply to plaintiffs' parcel because the parcel was not created pursuant to the Act. The fact of the parcel's creation is not in issue because the county's answer to the complaint "admits that 'Lot 132', the

subject land of these proceedings, was created by [a] pre-1893 Antiquated Subdivision map which map is commonly known as the 'Naples Townsite.' " Thus, we need not consider any of the prerequisites to creation of a parcel that preceded California's first subdivision map statute in 1893 (Stats. 1893, ch. 80, § 1, p. 96). Instead, the question presented by the county's contention is whether a parcel so created is covered by the present Act's merger provisions.

Section 66451.10(a) provides that contiguous parcels are not automatically merged by virtue of common ownership, and may be sold, leased or financed without further proceedings under the Act, if the parcels "have been created under the provisions of [the Act], or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, or . . . *were not subject to those provisions at the time of their creation . . . .*" (Italics added.) The county maintains that plaintiffs' parcel is not included in this provision because the parcel was not "established under or exempted from any law 'regulating the division of land.' " In other words, the county reads section 66451.10(a)'s phrase, "not subject to those provisions at the time of their creation," to mean "exempted from land-division provisions that were in existence at the time of the parcels' creation." We disagree with that strained interpretation. If, when the parcels were created, no land-division provisions were in existence, the parcels necessarily "were not subject to those provisions at the time of their creation."

Our construction of section 66451.10(a) is reinforced by a related provision of section 66451.11, which sets forth numerous conditions under which a local agency may require a merger of contiguous parcels that are commonly owned and are less than the minimum size required by the local zoning ordinance. As discussed earlier, some of section 66451.11's provisions allow the involuntary merger of a parcel that is less than 5,000 square feet, or fails to meet certain standards for development (e.g., water supply, sewage disposal, slope stability, vehicular access), or is inconsistent with an applicable general plan or local plan in respects other than minimum lot size. (For text of § 66451.11, see fn. 24, *ante.*) But under section 66451.11, subdivision (b)(2), a lot that is not eligible for merger under any of the section's other conditions may be involuntarily merged if it "[w]as not created in compliance with applicable laws and ordinances in effect at the time of its creation." That provision, which permits involuntary merger of parcels created in *violation* of then-applicable laws, regardless of any other circumstances, clearly does not apply to pre-1893 parcels created when there was not yet any land-division law to violate. The exclusion of pre-1893 parcels from blanket eligibility for involuntary merger under section 66451.11, subdivision (b)(2), implies a legislative intent to include such parcels in the Act's merger provisions.

Accordingly, we hold that the Act's merger provisions apply to parcels created before the effective date of any applicable law regulating the division of land.

### E. *Partial Legislative Suspension of Merger Provisions*

■ The county contends that any preemptive effect of the merger provisions has been nullified by the Legislature's identification of those provisions for suspension of a mandated higher level of county service.

Article III B, section 6, of the *California Constitution* requires the state to reimburse local governments for new programs or higher levels of service mandated by the state. Section 17581 provides: "(a) No local agency shall be required to implement or give effect to any statute . . . , or portion thereof, during any fiscal year if all of the following apply: [¶] (1) The statute . . . , or portion thereof, has been determined by the Legislature, the [Commission on State Mandates], or any court to mandate a new program or higher level of service requiring reimbursement . . . . [¶] (2) The statute . . . , or portion thereof, has been specifically identified by the Legislature in the Budget Act for the fiscal year as being one for which reimbursement is not provided . . . . [¶] (b) . . . [I]f a local agency elects to implement or give effect to [the statute], the local agency may assess fees . . . not exceed[ing] the costs reasonably borne by the local agency. . . ."

The State Budget Acts for the fiscal years 1990-1991, 1991-1992, 1992-1993, and 1993-1994 name "Real Property Subdivision Mergers (Ch. 845, Stats. 1983 [enacting §§ 66451.10-66451.21 and 66451.25-66451.31])" as a "mandate" identified for suspension.[25] It is unclear, however, which of the duties imposed on local agencies by the merger provisions have been officially determined to constitute new services requiring reimbursement. In the statutes enacting the merger provisions, any such determination was expressly disavowed on the ground that the local agency had authority to levy service charges for the mandated level of service. (Stats. 1983, ch. 845, § 5, p. 3103; Stats. 1984, ch. 102, § 6, p. 327.)

Some indication of what costs the Legislature declined to reimburse may be found in chapter 59 of the 1993 Statutes, enacted as an urgency measure on June 30, 1993. Section 1 states "the intent of the Legislature in enacting this act to relieve local entities of the duty to incur unnecessary expenses in

---

[25]The suspension provisions appear in each Budget Act under item 8885-101-001. (See, under that item, Stats. 1990, ch. 467, provision 5, subd. (s); Stats. 1991, ch. 118, provision 4, subd. (o); Stats. 1992, ch. 587, provision 4, subd. (o); Stats. 1993, ch. 55, provision 4, subd. (o).)

certain aspects of the following subjects: [¶] . . . [¶] (g) Real property subdivision mergers. . . ." (Stats. 1993, ch. 59, § 1.) Section 23 provides: "The Legislature finds and declares that certain state-mandated local programs which in prior years have been suspended through nonappropriation in the state budget should be permanently eliminated and that this is the purpose of this act." (*Id.*, ch. 59, § 23.) The "act" amends only one of the merger provisions with which we are concerned here: Section 7 of the legislation amends section 66451.13 to provide that before recording a notice of merger, the local agency "may," instead of "shall," send the owner by certified mail, and record, a notice of intention to determine status. (*Id.*, ch. 59, § 7.)[26]

These statutes suspending or eliminating some of the mandated services from the merger provisions do not impinge upon the legislative determination in section 66451.11 of the conditions prerequisite to imposition of a parcel merger by a local agency. (See fn. 24, *ante.*) Those conditions remain as an implied preemption of any zoning ordinance that purports to require a merger when those conditions have not been met.

F. *Coastal Act's Effect on Preemption*

 The county, and the California Coastal Commission appearing as amicus curiae, contend that because the county ordinances were required to be approved by the commission as part of the county's local coastal program (see Pub. Resources Code, § 30500 et seq.; *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 570 [276 Cal.Rptr. 410, 801 P.2d 1161]), the ordinances constituted implementation of the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) and so cannot be preempted as merely local legislation. The merger provisions themselves, however, spell out their relationship to the Coastal Act. Section 66451.11, subdivision (b)(E) (hereafter section 66451.11(b)(E)) provides that the preemptive merger standards of section 66451.11 do not apply if "[w]ithin the coastal zone, . . . one or more of the contiguous parcels . . . has, *prior to July 1, 1981*, been identified or designated as being of insufficient size to support residential development [by] either (i) . . . the land use plan portion of a local coastal program . . . , or (ii) prior to the adoption of a land use plan, . . . by formal action of the California Coastal Commission . . . ." (Italics added.) Conversely, any coastal parcel identified *after* July 1, 1981, in the manner described in section 66451.11(b)(E), as being insufficient for

---

[26]Sections 8 and 9 make it optional, instead of mandatory, for a local agency to publish a resolution of intention before amending a merger ordinance that was in existence on January 1, 1984, or adopting a new merger ordinance under section 66451.11. (Stats. 1993, ch. 59, §§ 8, 9, amending §§ 66451.20, 66451.21.)

development, remains subject to the preemptive merger standards. As explained in footnote 23, *ante*, the county does not contend here that plaintiffs' parcel was excluded from the operation of those standards by any such identification prior to July 1, 1981.

## V. CONCLUSION

Plaintiffs and their supporting amici curiae insist that the Subdivision Map Act's merger provisions preempt any provision of a local zoning ordinance requiring merger as a condition to issuance of a development permit. Under plaintiffs' theory, the only way that a city or county may compel a parcel merger is to enact a merger ordinance (see § 66451.21), search the records for the descriptions and owners of parcels eligible for merger, determine which of the eligible parcels to merge, and then initiate and implement the merger ordinance procedures provided by sections 66451.12 to 66451.18, regardless of whether the parcel owners have given any thought to the possibility of merger.

The county and its supporters, on the other hand, contend that the Subdivision Map Act's merger provisions pertain only to "local agency initiated merger" for purposes of "sale, lease, or financing," and have nothing to do with regulation of development through zoning ordinances, including requirements in those ordinances of parcel merger as a prerequisite for a development permit. Under the county's theory, the county may use its zoning ordinances to require parcel mergers that could not be compelled under the detailed conditions laid down by section 66451.11 for compelling merger under a Subdivision Map Act merger ordinance.

We have concluded that neither position is correct. Section 66451.10 expressly preempts only local agency initiated parcel mergers for the purpose of regulating the sale, lease, and financing of individual parcels. Section 66451.11, however, reflects a paramount state concern for uniformity in the conditions under which a local agency may impose parcel merger for purposes of regulating development as well. Because of that concern, section 66451.11 impliedly preempts zoning ordinances requiring, for issuance of a development permit, the merger of parcels that would not have been eligible subjects of merger under the standards of that section. Local agencies remain free, however, to impose such a merger requirement upon parcels that do meet those standards.

The judgment from which this appeal is taken is not appealable because it does not complete the disposition of all of the causes of action against the county alleged in the complaint and therefore is not final. We have reached

the merits, however, as a basis for determining whether the notice of appeal should be treated as a petition for a writ of mandate. We conclude that the trial court's judgment declaring the county ordinances to be preempted by, and therefore invalid under, sections 66451.10 to 66451.21 of the Subdivision Map Act is correct, because the purpose for which the ordinances require merger, i.e., "to comply with current density standards," is not a permissible ground for compelling merger under section 66451.11 (see § 66451.11, subd. (b)(7)). Accordingly, there appears no need for issuance of a writ of mandate to the trial court.

The judgment of the Court of Appeal is reversed with directions to dismiss the appeal.

Kennard, J., Arabian, J., Baxter, J., George, J., and Kremer, J.,* concurred.

**MOSK, J.**—I concur in the judgment. I write separately to emphasize the narrowness of our holding with respect to the validation of antiquated "paper subdivisions."

As amici curiae in this case point out, there exist throughout California many thousands of subdivision lots ostensibly created prior to the state's first subdivision law in 1893, lots which have never been sold or leased as separate parcels. These subdivisions are the legacies of 19th century would-be developers whose dreams of carving up their land into profitable real estate parcels went only as far as the county recorder's office. The legal status of those paper subdivisions has not been resolved by the state merger law, nor by the majority's decision.

Government Code section 66451.10, subdivision (a) (all unlabeled statutory references are to this code), provides that automatic merger does not apply to "two or more contiguous parcels or units of land which have been created under the provisions of this division, or any prior law regulating the division of land, or a local ordinance enacted pursuant thereto, or which were not subject to those provisions at the time of their creation . . . ." What the statute does not set forth, and what the majority rightly do not decide today, is what constitutes the "creation" of a parcel, subject to the state merger provisions, if that parcel purportedly came into existence prior to the first subdivision law in 1893.

The majority instead hold that, whatever the rule for pre-1893 paper subdivisions, the subdivision lot in question exists because the County of

---

*Presiding Justice, Court of Appeal, Fourth Appellate District, Division One, assigned by the Acting Chairperson of the Judicial Council.

Santa Barbara (hereafter County), in its answer to plaintiffs' complaint, said it exists. Because of this admission, the majority claim they do not consider "any of the prerequisites to creation of a parcel that preceded California's first subdivision map statute in 1893 . . . ." (Maj. opn., *ante*, at p. 761.)

The majority then address the question whether a parcel created before 1893 is subject to the merger law and conclude that it is, rejecting the County's contention that section 66451.10, subdivision (a) applies only to subdivisions subject to, or exempt from, post-1893 subdivision law—a position that would effectively invalidate all subdivisions originating before 1893. But the majority are not entirely correct in implying that whether a pre-1893 lot has been created and whether the merger statutes apply to such lots, are entirely distinct questions. For the majority's position that subdivisions *could* be created prior to 1893 implies that lots may be created outside of the framework of subdivision statutes or ordinances. Because there were no subdivision laws prior to 1893, the majority's position may give rise to the inference that *all* subdivisions recorded before 1893 can be said to be legally "created," since there was no statute in place by which a subdivision could be judged to have been unlawfully created. Such an inference would, in my view, be incorrect.

Even in its earliest incarnations, California subdivision law has sought to ensure at the very least that subdividers provided accurate maps with sufficient information to give constructive notice of the subdivision to the public and to subsequent purchasers. (See Curtin et al., Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 1.2, pp. 2-3.) The 1893 statute, for example, provided that the "proprietor" of a subdivision "cause to be made out an accurate map or plat thereof," which would accurately depict the boundaries and uses of property reserved for public purposes, and which further accurately describe "[a]ll lots intended for sale, either by number or letter, and their precise length and width." (Stats. 1893, ch. 80, § 1, p. 96.) Moreover, it is an elementary common law rule that a deed conveying real property can be voided if the property description is insufficiently definite to permit the property to be readily located. (*Saterstrom* v. *Glick Bros. Sash. etc. Co.* (1931) 118 Cal.App. 379, 380-381 [5 P.2d 21]; *Scott* v. *Woodworth* (1907) 34 Cal.App. 400, 409 [167 P. 543].)

In this case, the County and amicus curiae County Counsel's Association of California point to the inaccuracy and lack of information on the one-page map that purportedly created the Naples subdivision in 1888.[1] I doubt whether a subdivision map that does not even meet the standard of the

---

[1] As County Counsel's Association of California describes it, "[t]he Plan of Naples is a one-page sketch map recorded in 1888. It depicts approximately 240 rectangular blocks and

common law, or of the 1893 statute, by accurately depicting and recording a subdivision can be said to "create" that subdivision within the meaning of section 66451.10, subdivision (a), particularly where that subdivision's only subsequent existence has been on paper. (See *John Taft Corp.* v. *Advisory Agency* (1984) 161 Cal.App.3d 749, 756-757 [207 Cal.Rptr. 840] [purported subdivision lots depicted on United States Survey map filed in 1878, but not recorded with the county, does not create subdivision under the Subdivision Map Act].)

Because of the County's concession,[2] this court has been spared the task of addressing an issue this case would have otherwise raised: at what point can a map recorded prior to 1893 that purports to create contiguous subdivision parcels be so inaccurate or so lacking in information as to fail in fact to "create" these parcels within the meaning of section 66451.10, subdivision (a)? The answer to that question awaits further judicial—or legislative—clarification.

---

irregular fractional blocks, of which about 227 are numbered. The blocks numbered 31, 44, 60, 69, 70 and 142 are shown divided into approximately 170 pencil-shaped parcels that are unnumbered. The paucity of information on the map reveals that it does not qualify as a record of survey. For example, it gives no dimensions for any of the parcels or for the vast majority of the blocks, and lacks references to bearings, monuments, relationships to adjacent tracts, scale, compass points, or the date of any survey. (See Bus.&Prof. [Code §] 8764.) The map does show the blocks as being separated by a rigidly rectangular grid of streets drawn in apparent disregard for topography and natural features. The streets, in blind obedience to this plan, run straight across the barrancas depicted on the map and plunge over the coastal cliffs into the sea. Petitioners claim that each of these 240 blocks and 170 parcels must be recognized as a legal parcel for the purposes of the modern Subdivision Map Act."

[2]In addition to the concession made in its answer, the County has made other admissions as to the legal existence of lot 132, most notably in the certificate of compliance issued for the property in 1986, which stated that the lot is a "legal parcel having been created in 1888 in compliance with the provisions of the California Subdivision Map and at that time there was no County of Santa Barbara Ordinance enacted pursuant thereto." However, this case does not decide whether acts of recognition such as those performed by the County in this case could estop a County from asserting that a parcel had not been "created" for purposes of section 66451.10, subdivision (a).